## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

| | | |
|---|---|---|
| SCOTT ALLEN PEMBERTON, | ) | |
| as Administrator and personal | ) | |
| representative of the ESTATE of | ) | |
| BENNY SHANE PEMBERTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. _____ |
| | ) | |
| SCOTT COUNTY, Tennessee, | ) | Jury of Twelve Demanded |
| a governmental entity; | ) | |
| RONNIE PHILLIPS, individually; | ) | |
| TOMMY SILCOX, individually; | ) | |
| RANDY LEWALLEN, individually; | ) | |
| BRITTNEY BROWN, individually; | ) | |
| DEREK PHILLIPS, individually; | ) | |
| LEE JOHNSON, individually; | ) | |
| AMY NICELY,  individually; | ) | |
| TANNER BOSHEARS,  individually; | ) | |
| SHANE MASON,  individually; | ) | |
| ADVANCED CORRECTIONAL | ) | |
| HEALTHCARE, INC.; | ) | |
| EDWARD W. CAPPARELLI, M.D.; | ) | |
| BRITTANY MASSENGALE, LPN, and | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

# TABLE OF CONTENTS

I.     NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.    CAST OF CHARACTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       A.    SCSO Supervisory Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       B.    Corrections Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       C.    ACH and ACH Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       D.    EMTs and Medical Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       E.    Trusties and Inmates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       F.    Other Law Enforcement Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       G.    Pemberton Family and Friends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       A.    Mr. Pemberton Is Jailed and Exhibits Symptoms of a Serious Illness . . . . . . . .  17

       B.    Mr. Pemberton Is Infected With MRSA – a Potentially Fatal Staph Bacteria

             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       C.    Each Hour, Mr. Pemberton's Medical Condition Was Getting Progressively
             Worse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       D.    "He Was Very Sick.  He Was Very Very Sick" . . . . . . . . . . . . . . . . . . . . . 23

       E.    Corrections Officers Move Mr. Pemberton to "the Hole" In Order to Not
             Have to Deal with Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

25

-ii-

F.    Inmates Describe Mr. Pemberton As "Getting Around Like a 90-Year Old Man" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

G.    Mr. Pemberton Received No Medical Treatment for the Staph Infection Spreading Through His Body . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

H.    "It Got to Where He Couldn't Do Anything" . . . . . . . . . . . . . . . . . . . . . . . . 25

I.    Mr. Pemberton "Begged for Medical Attention the Whole Time He Was There" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

J.    As the MRSA Infection Began Causing Multiple-Organ Failure and Likely Entered His Brain, Corrections Officers and Medical Staff Failed to Help Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

K.    Mr. Pemberton's Last Two Nights Culminate in Him Being Found Lying Naked and Unconscious in His Cell in His Own Urine and Excrement. . . . . . . 30

L.    Mr. Pemberton is Treated at NKMC and Transferred . . . . . . . . . . . . . . . . . . . . 34

M.    On Arrival at UTMC, Mr. Pemberton Is Likely Brain-Dead, But Physicians Attempt to Save Him Via Brain Surgery . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

N.    Autopsy Reveals MRSA Had Entered Mr. Pemberton's Brain, Heart, and Multiple Other Organs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

O.    Inmate Statements Concerning Mr. Pemberton's Medical Condition and Corrections Officers' Knowledge of It Make it Clear His Condition Was Known . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

P.    Corrections Officers Misrepresented and Concealed Information About the Circumstances Surrounding Mr. Pemberton's Medical Condition . . . . . . . . . . . 39

Q.    Scott County's Refusal to Discuss the Case or to Investigate the Circumstances Surrounding Mr. Pemberton's Death . . . . . . . . . . . . . . . . . . . . . 42

R.    State Inspections Find Medical Care at SCJ Deficient . . . . . . . . . . . . . . . . . . . . 44

S.    Scott County's Own Policy Requires an Actual Medical Evaluation . . . . . . . . . 45

T.    Similar Instances of Inadequate Medical Care and Severe Neglect at the SCJ in 2016-17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

-iii-

U.      The Pattern of Inadequate Medical Care and Deliberate Indifference to the
        Serious Medical Conditions of Inmates Continues at the SCJ . . . . . . . . . . . . . . 47

VI.  WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VII. CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        COUNT ONE – VIOLATION OF CIVIL RIGHTS LAWS UNDER COLOR OF
        LAW, 42 U.S.C. § § 1983 and 1988, Failure to Provide Adequate Medical Care
        (Against Individual Defendants). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        COUNT TWO – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
        42 U.S.C. §§ 1983 and 1988, Failure to Train and Supervise/Acquiescing-In and
        Ratifying Unconstitutional Conduct of Subordinates (Against Sheriff Philips, Chief
        Deputy Silcox, and Chief Detective Lewallen) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

        COUNT THREE – VIOLATION OF FEDERAL CIVIL RIGHTS
        42 U.S.C. §§ 1983 and 1988, Failure to Protect (Against All Individual Defendants)
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        COUNT FOUR – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
        42 U.S.C. §§ 1983 and 1988 (MONELL CLAIM) Policy, Custom, Failure to Provide
        Adequate Medical Care (Against Scott County) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        COUNT FIVE – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
        42 U.S.C. §§ 1983 and 1988 (MONELL CLAIM) Failure to Train and Supervise and
        Ratification of Unconstitutional Conduct (Against Scott County). . . . . . . . . . . . . . . 62

        COUNT SIX – VIOLATION OF FEDERAL CIVIL RIGHTS
        42 U.S.C. §§ 1983 and 1988 (MONELL CLAIM) Use of Cruel and Unusual
        Punishment (Against Scott County) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

        COUNT SEVEN – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
        42 U.S.C. §§ 1983 and 1988 (MONELL CLAIM) Custom, Policy, Pattern, or
        Practice of Deliberate Indifference in Failing to Provide Adequate Medical Care to
        Inmates (Against Advanced Correctional Healthcare and Scott County) . . . . . . . . . . 69

                A.      ACH and Scott County Prioritize "Cost-Control" over Inmate
                        Health and Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

                B.      ACH's History of Providing Inadequate Medical Care to
                        Inmates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

-iv-

COUNT EIGHT – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
42 U.S.C. §§ 1983 and 1988 (MONELL CLAIM) Failure to Train and/or Supervise
(Against Advanced Correctional Healthcare). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

COUNT NINE – WRONGFUL DEATH, TENN. CODE ANN. §§ 20-5-106 et seq.
(Against Individual Scott County Defendants). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

COUNT TEN – OUTRAGEOUS CONDUCT/ INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS (Against Individual Scott County Defendants) . . . . . . . . . 84

VIII.   JURY DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

IX.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

**COMES** SCOTT ALLEN PEMBERTON, as Administrator and Personal Representative of the ESTATE of BENNY SHANE PEMBERTON ("Plaintiff"), and files this Complaint against the Defendants, SCOTT COUNTY, Tennessee, RONNIE PHILLIPS, individually, TOMMY SILCOX, individually, RANDY LEWALLEN, individually, BRITTNEY BROWN, individually, DEREK PHILLIPS, individually, LEE JOHNSON, individually, AMY NICELY, individually, TANNER BOSHEARS, individually, SHANE MASON, individually, ADVANCED CORRECTIONAL HEALTHCARE, INC.; EDWARD W. CAPPARELLI, M.D.; and BRITTANY MASSENGALE, LPN (collectively, "Defendants").

## I. NATURE OF ACTION[1]

1.    Benny Shane Pemberton ("Mr. Pemberton" or "the Decedent") was a slightly-built forty-one (41)-year old father of two when he was arrested on July 6, 2016 on an out-of-state warrant for failure to pay child support and booked in the Scott County Jail ("SCJ") under a $200 bond. By July 19, 2016, Mr. Pemberton was found curled up on a dirty cell floor, alone, naked, and unconscious, amidst his own excrement and urine. His body was in a decrepit state, with signs of gangrene on his foot, hands, fingers. According to the autopsy report performed by Knox County Chief Medical Examiner, Dr. Darinka Mileusnic-Polchan ("Dr. Mileusnic"), Mr. Pemberton died as a result of sepsis, a bacterial infection in his body. Although he exhibited and complained about numerous symptoms, his condition was never medically treated while he was incarcerated, allowing infectious disease to spread throughout his body, eventually to his brain.

---

[1] Plaintiff, the Estate of Benny Shane Pemberton, filed an original action, asserting the same claims against the same Defendants based upon substantially identical facts, on July 20, 2017. *See Sexton-Pemberton v. Scott County, et al.*, No. 3:17-cv-00310-TRM-HBG, at Doc. 1 (E.D. Tenn.). On January 2, 2019, on motion of the Plaintiff to voluntarily dismiss the action [*see id*, at Doc. 81], the Court entered an order dismissing the action without prejudice. [*See id*, at Doc. 90].

-1-

2.     An autopsy found septal abscesses in Mr. Pemberton's liver, kidneys, spleen, and pancreas. His brain – filled with "massive bacterial colonies" – had virtually disintegrated. Approximately five days before his death, as Mr. Pemberton's organs began to fail, he lost control of bodily functions and became unable to stand, walk, or eat, as his body temperature dropped to hypothermic levels.

3.     According to several inmates, Mr. Pemberton asked for medical assistance over and over again during his two-week incarceration at the SCJ. However, the SCJ staff unreasonably surmised that Mr. Pemberton was "faking" and ignored his pleas for help, rendered him no meaningful medical attention until he was already brain-dead. In the two-week interval, Mr. Pemberton – in unbearable pain caused by the staph infection spreading through his body – had begged for help. Even a lay person with no medical training could see – and many did see – that Mr. Pemberton was seriously ill.

4.     Inmate after inmate tried to convince Corrections Officers to help Mr. Pemberton, but their efforts, like Mr. Pemberton's own, were also ignored. By July19, 2016, Mr. Pemberton's health deteriorated to the point where he was found lying unconscious on the floor of his cell, unable to even stand, having urinated and defecated on himself. Only after two SCJ Trusties – acting on orders from the shift supervisor – had dragged Mr. Pemberton's lifeless body to the showers and cleaned him up, dressed him, and placed his body in a restraint chair, were EMTs were called. Mr. Pemberton was transported to a hospital in Knoxville, and was later pronounced dead at the University of Tennessee Medical Center.

5.     Throughout his two-week incarceration, Mr. Pemberton received no medical help to stop the staph infection spreading through his body. He was seen once by a nurse and was never seen

-2-

by a physician. Instead, weary of the noise created by Mr. Pemberton, *e.g.*, cries and screams, beating on the door, and requests for assistance, the officer-in-charge, Sgt. Brittany Brown ("Sgt. Brown"), ultimately ordered Corrections Officers to move Mr. Pemberton into an isolation-cell – Holding Cell #1, located near the sally-port and known as "the hole," "no-man's land," or the "out-of-sight, out-of-mind" cell – where inmates are placed when Corrections Officers do not want to deal with them.

6.     After several days in SCJ, Mr. Pemberton could not walk to the restroom or shower without assistance. He was, according to witnesses, ***"getting around like a 90-year old man."*** Eventually, he could not even make it to the cell-door for food or medicine. In his final days, Mr. Pemberton was unable to get out of the bed, having to be helped or even carried by Corrections Officers. Eventually, he lost his appetite and stopped eating. He lost control of his bodily functions and began to urinate and defecating on himself, as one after another, his organs failed and began to shut down. On one occasion, Sgt. Shane Mason came into Mr. Pemberton's cell, lifted the slightly-built sickly man off of his bed, put him in a restraint chair, and rolled him to another part of the SCJ. Still, other than a single instance on July 8, 2016, Mr. Pemberton was not seen by a nurse, examined by a doctor, or taken to a hospital until July 20, 2016, at which point he was brain-dead.

7.     Mr. Pemberton complained to Corrections Officers about an awful pain in his left leg. According to one inmate, "it got to where he couldn't do anything." Corrections Officers "finally came in to check on him . . . and basically carried him out of the cell and . . . put him in the 'hole,'" where he "begged for medical attention the whole time he was there."

8.     By July 16, 2016, Mr. Pemberton was "breaking out in sweats, can't walk good, throwing up, feeling dizzy." Sgt. Mason contacted the site physician, Dr. Edward W. Capparelli

("Dr. Capparelli"), who told him to give Mr. Pemberton "something sweet (orange juice or a peanut butter sandwich)." There is no record that Dr. Capparelli ever examined Mr. Pemberton or followed up on Mr. Pemberton's condition.

9. On July 18, 2016, a Corrections Officer tried to wake Mr. Pemberton, but he was unresponsive. EMTs were called and advised Sgt. Brown that Mr. Pemberton required immediate hospitalization. Sgt. Brown refused to allow the EMTs to transport Mr. Pemberton to the hospital.

10. In the early morning of July 20, 2016, Mr. Pemberton was found unconscious, not breathing, and lying naked in his own urine and excrement on the cell floor. Sgt. Brown called Dr. Capparelli, who told her to get Mr. Pemberton to the hospital. However, instead of immediately calling 911, Sgt. Brown ordered two SCJ trusties[2] to drag Mr. Pemberton's lifeless body to the showers, clean him up, dress him, and sit him up in a restraint chair. Only after all of this had happened did Sgt. Brown begrudgingly call for an ambulance.

11. EMTs Rick Russ and Christopher Wilson arrived and performed CPR on Mr. Pemberton. They regained a pulse, intubated Mr. Pemberton, and transported him to North Knoxville Medical Center ("NKMC"), where doctors – misinformed by Corrections Officers about the circumstances surrounding Mr. Pemberton's medical condition[3] – diagnosed him as suffering

---

[2]A trusty is a prisoner or convict considered trustworthy and allowed special privileges. https://www.merriam-webster.com/dictionary/trusty.

[3]Sgt. Phillips and Officer Brown withheld the nature of Mr. Pemberton's medical condition to EMTs and hospital medical staff, *i.e.*, failing to inform them that Mr. Pemberton had been sick for almost two weeks with severe pain, a high fever, unable to walk, get out of bed, eat, or control his bodily functions.

-4-

from an intra-cranial hemorrhage, intra-cranial bleed, sub-dural hypotension, and cardiac arrest. After determining that Mr. Pemberton required a higher level of care, including neurosurgery, they arranged to transfer him to The University of Tennessee Medical Center ("UTMC") in Knoxville.

12. Upon his arrival at UTMC, Mr. Pemberton was already brain-dead. After assessing Mr. Pemberton's injuries, incorrectly believing he had been assaulted, a UTMC neurosurgeon performed a craniotomy, opening his skull to attempt emergent-decompression of his brain stem. But Mr. Pemberton never regained consciousness, and at 3:28 p.m. on July 20, 2016, he was pronounced dead by UTMC Dr. Jace M. Perkerson.

13. Laboratory results later established that Mr. Pemberton had suffered from a staph infection, Methicillin-Resistant Staphylococcus Aureus ("MRSA"). The cause of death was septic endocartitis, or MRSA, a treatable condition if given proper antibiotics.

14. From the minute he was processed and booked, Mr. Pemberton's complaints were altogether disregarded by SCSO Corrections Officers, Nurse Massengale, and Dr. Capparelli. Every Corrections Officer who came into contact with him, as well as Nurse Massengale and Dr. Capparelli, had an opportunity to help him, but did not.

15. Dr. Mileusnic stated that Mr. Pemberton would have been comatose when transported to NKMC from the SCJ. He certainly would not have been able to talk, much less walk, as some Correctional Officers reported. Thus, statements by Sgt. Brown and Officers Boshears and Amy Nicely that he was "alert," "conscious," "asking for a shower," and that his medical status was "good" just *fifteen minutes* before he was transported to the hospital are gross misrepresentations, part of a scheme to cover-up the circumstances surrounding Mr. Pemberton's death.[4]

_____

[4]Upon information and belief, this collusion began shortly after Mr. Pemberton was taken away from the SCJ to the hospital and includes efforts by Correction Officers to make their

-5-

16. Mr. Pemberton should have been safe and protected in Scott County's custody. Instead, he was neglected, his worsening medical condition ignored, and caused to suffer unbearable pain, inhuman indignities, and substantial mental anguish.

17. Both Scott County and Advanced Correctional Healthcare, Inc. ("ACH") have a documented history of failing to provide adequate medical care to inmates placed in their care. In the end, that deliberate indifference to the serious medical needs of inmates was the moving force behind these violations behind a litany of constitutional violations.

18. All of the Defendants were required to take reasonable measures to guarantee the safety of Mr. Pemberton and had a duty to protect him from harm. They failed to take any measures to protect him. Therefore, Plaintiff alleges the following claims:

> ■ Count One – failure of the Individual Defendants to provide adequate medical care to Mr. Pemberton;
>
> ■ Count Two – failure of Sheriff Phillips, Chief Deputy Silcox, and Chief Detective Lewallen to train and supervise officers in the provision of adequate medical care, and acquiescing and ratifying unconstitutional conduct of their subordinates;
>
> ■ Count Three – failure of the Individual Defendants to protect Mr. Pemberton from harm;
>
> ■ Count Four – Scott County's policy or custom of deliberate indifference to providing adequate medical care to inmates;
>
> ■ Count Five – Scott County's policy or custom of failing to train and supervise officers in the provision of adequate medical care to inmates, and ratification of unconstitutional conduct of subordinates;
>
> ■ Count Six – Scott County's policy or custom of using "the hole" to isolate seriously-ill inmates without providing adequate medical care;

---

stories appear consistent and to grossly embellish the actual facts.

- Count Seven – Scott County and ACH's policy or custom of deliberate indifference to providing adequate medical care to inmates;

- Count Eight – ACH's failure to train or supervise personnel in the provision of adequate medical care to inmates;

- Count Nine – wrongful death (against the Individual Defendants; and

- Count Ten – intentional infliction of emotional distress.

19. Plaintiff requests compensatory and punitive damages, as well as attorneys' fees, costs, expenses, and all other available and appropriate relief.

## II. JURISDICTION AND VENUE

20. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under the Constitution of the United States and 42 U.S.C. § 1983.

21. This Court has supplemental jurisdiction over any claims brought under Tennessee law pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

22. Venue lies in the United States District Court for the Eastern District of Tennessee because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Scott County. 28 U.S.C. § 1391(b)(2).

## III. PARTIES

### A. Plaintiff

23. Scott Allen Pemberton ("Scott Pemberton"), brother of the decedent, Benny Shane Pemberton ("Mr. Pemberton" or "the Decedent"), was appointed on December 9, 2019 by the Probate Court for Scott County, Tennessee, to be the Administrator of the Estate of Benny Shane

-7-

Pemberton ("the Estate"). His appointment was necessary in order to replace the Estate's original personal representative, Ms. Donna Jean Sexton-Pemberton, as a result of Ms. Sexton-Pemberton death on June 6, 2019. Scott Pemberton is the lawful and duly-appointed Administrator of the Decedent's Estate. During all relevant times, Plaintiff and the Decedent were citizens and residents of Scott County, Tennessee.

### B. Defendants

24.    Scott County, Tennessee ("Scott County") is a governmental entity and political subdivision of the State of Tennessee, duly organized.  It may be served through its chief executive officer, County Mayor Dale Perdue, at the Scott County Office Building, 2845 Baker Highway, Huntsville, TN 37756. Scott County possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment and removal of individual members of the Scott County Sheriff's Office ("SCSO"), and to assure that actions, policies, rules, regulations, practices and procedures of the SCSO and its employees comply with the laws and constitutions of the United States and Tennessee.

25.    Scott County and SCSO are answerable for the safekeeping of persons in their custody and responsible for all matters relating to the selection, supervision, promotion, training, and discipline of employees, including uniformed and non-uniformed employees.

26.    The Scott County Jail ("SCJ"), located at the Scott County Justice Center in Huntsville, Tennessee, was built in 2008 and has a capacity for 110 male inmates. The SCJ is staffed by approximately 25 SCSO employees.

27.    At all relevant times, Defendant, Sheriff Ronnie Phillips ("Sheriff Phillips") was the duly-elected Sheriff of Scott County, statutorily responsible for the screening, hiring, firing, training

and the supervision of SCSO personnel; and responsible for the safety and welfare of those in custody. Sheriff Phillips is sued in his individual capacity and as principal on his official bond. Sheriff Phillips was operating under color of law. Sheriff Phillips is, upon information and belief, a citizen and resident of Scott County and may be served with process at the SCSO, Scott County Justice Center, 535 Scott Highway, Huntsville, TN 37756.

28.     At all relevant times, Defendant, Tommy Silcox ("Chief Deputy Silcox"), was employed by the SCSO as Chief Deputy. Chief Deputy Silcox is sued in his individual capacity and as principal on his official bond. Chief Deputy Silcox was operating under color of law. Chief Deputy Silcox is, upon information and belief, a citizen and resident of Scott County and may be served with process at the SCSO, Scott County Justice Center, 535 Scott Highway, Huntsville, TN 37756.

29.     At all relevant times, Defendant, Randy Lewallen, ("Detective Lewallen"), was employed by the SCSO as Chief Detective. Detective Lewallen is sued in his individual capacity and as principal on his official bond. Detective Lewallen was operating under color of law. Detective Lewallen is, upon information and belief, a citizen and resident of Scott County and may be served with process at the SCSO, Scott County Justice Center, 535 Scott Highway, Huntsville, TN 37756.

30.     At all relevant times, Defendant, Shane Mason ("Sgt. Mason"), was employed by the SCSO as a Corrections Officer. Sgt. Mason is sued in his individual capacity and as principal on his official bond. Sgt. Mason was operating under color of law. Sgt. Mason is, upon information and belief, no longer employed by Scott County. He is a citizen and resident of Scott County and may be served with process at 174 Ida Bell Lane, Huntsville, TN 37756.

-9-

31.     At all relevant times, Defendant, Brittney Brown ("Sgt. Brown"), was employed by the SCSO as a Corrections Officer. Sgt. Brown is sued in her individual capacity and as principal on her official bond.  Sgt. Brown was operating under color of law. Sgt. Brown is, upon information and belief, no longer employed as a Corrections Officer by Scott County and is employed by the Tennessee Department of Probation and Paroles in Clinton, Tennessee. She is a citizen and resident of Scott County, residing at 492 Stephen Road, Helenwood, TN 37755, and may be served with process at the Tennessee Department of Corrections Field Office at 110 E. Centre Stage Business Park, Clinton, TN 37716.

32.     At all relevant times, Defendant, Derek Phillips ("Sgt. Phillips"), was employed by the SCSO as a Corrections Officer. Sgt. Phillips is being sued in his individual capacity and as principal on his official bond. Sgt. Phillips was operating under color of law.  Sgt. Phillips is, upon information and belief, a citizen and resident of Scott County and may be served with process at the SCJ, 535 Scott Highway, Huntsville, TN 37756.

33.     At all relevant times, Defendant, Ronald L. ("Lee") Johnson ("Officer Johnson"), was employed by the SCSO as a Corrections Officer.  He is currently employed by the SCSO as a patrol deputy. Officer Johnson is being sued in his individual capacity and as principal on his official bond. Officer Johnson was operating under color of law. Officer Johnson is, upon information and belief, a citizen and resident of Scott County and may be served with process at the SCSO, 535 Scott Highway, Huntsville, TN 37756.

34.     At all relevant times, Defendant, Tanner Boshears ("Officer Boshears"), was employed by the SCSO as a Corrections Officer. Officer Boshears is being sued in his individual capacity and as principal on his official bond. Officer Boshears was operating under color of law.

-10-

Officer Boshears is, upon information and belief, now employed as a patrol deputy. He a citizen and resident of Scott County and may be served with process at the SCSO, 535 Scott Highway, Huntsville, TN 37756.

35.     At all relevant times, Defendant, Amy Nicely ("Officer Nicely"), was employed by the SCSO as a Corrections Officer. Officer Nicely is being sued in her individual capacity and as principal on her official bond.  Officer Nicely was operating under color of law. Officer Nicely is, upon information and belief, a citizen and resident of Scott County and may be served with process at the SCJ, 535 Scott Highway, Huntsville, TN 37756.

36.     At all relevant times, Defendant, Advanced Correctional Healthcare, Inc. ("ACH"), was an Illinois corporation, with its principal place of business at 3922 Barring Trace, Peoria, IL 61615-2500 licensed to do business in the State of Tennessee. ACH contracted with Scott County to provide medical services to inmates at the SCJ. ACH  was responsible for the establishment of policies, either formally or by custom for the provision of such services. ACH was responsible for the employment, training, supervision and conduct of its medical staff, including Dr. Capparelli and Nurse Massengale. ACH can be served through its registered agent for service of process, CT Corporation System, 800 S. Gay St., Ste. 2021, Knoxville, TN 37929-9710.

37.     As part of ACH's business, it provides contract services to correctional facilities under contract with various governmental entities. At all times relevant to this action, ACH conducted business within Scott County. ACH provided services within the SCJ with the full authority of the government of the State of Tennessee, pursuant to Tenn. Code Ann. §41-24-101, et seq. and/or §41-8-101, et seq., and therefore acts under color of state law. ACH is the entity charged to provide services at the SCJ within the confines of the law and contract with Scott County

-11-

and has a non-delegable duty to ensure that the conditions of confinement and health and safety of persons incarcerated at the SCJ, including Mr. Pemberton, are protected, in compliance with the Constitution and laws of the United States.

38.    ACH is responsible for the implementation of policies, procedures, practices and customs challenged herein required to be performed by law or contract. ACH is also responsible for ensuring the SCJ is in compliance with the Constitution and laws of the United States with respect to the matters entrusted to it by law and contract.  At all pertinent times mentioned herein, ACH was a state actor, performing the requisite state governmental functions, and had a non-delegable duty to ensure the proper and safe operation of the SCJ entrusted to it by law and contract.

39.    To perform its services at the SCJ, ACH utilizes employees, agents or contractors, including Dr. Capparelli and Nurse Massengale, who perform services, including professional medical services, under color of state law and within the course and scope of their employment, agency, apparent authority or contract with Scott County.

40.    ACH is liable for its own conduct and the acts and omissions of its servants, employees, agents and contractors by virtue of the fact that they acted in conformity with the policies, practices and customs of ACH and pursuant to the doctrines of agency, apparent agency, implied agency, employer/employee relations, joint and several liability, respondeat superior, vicarious liability, contract and as a result of ACH's non-delegable duty to ensure the health and safety of the persons held in custody at the SCJ.

41.    At all relevant times, Defendant, Edward W. Capparelli, M.D. ("Dr. Capparelli"), was servicing inmates at the SCJ as an employee of ACH. Dr. Capparelli violated Mr. Pemberton's civil and constitutional rights as set forth below. At all times material hereto, Dr. Capparelli was acting

-12-

under color of state law and is subject to suit under 28 U.S.C. § 1983. Dr. Capparelli may be served at Mountain Peoples Health Council Oneida Clinic, 460 Industrial Lane, Oneida, TN 37841.

42.     At all relevant times, Defendant, Brittany Massengale, LPN ("Nurse Massengale"), was servicing inmates at the SCJ as an employee of ACH. Nurse Massengale violated Mr. Pemberton's civil and constitutional rights as set forth below. At all times material hereto, and upon information and belief, Nurse Massengale was acting under color of state law and is subject to this action pursuant to 42 U.S.C. §1983. Nurse Massengale is, upon information and belief, no longer employed by ACH, and is employed at Huntsville Manor, a nursing home. She may be served with process at Huntsville Manor, 287 Baker St., Huntsville, TN 37756.

## IV.  CAST OF CHARACTERS

### A.     SCSO Supervisory Personnel

43.     As Scott County Sheriff, Defendant Sheriff Phillips has a duty to protect inmates placed in his custody. He is also responsible for training and supervising SCSO personnel, including SCJ Corrections Officers, and for disciplining employees, when necessary.

44.     Defendant Chief Deputy Silcox is responsible for conducting weekly checks of the SCJ to insure facilities are maintained and that all inmates are behaving appropriately.

45.     Defendant Chief Detective Lewallen's is employed by the SCSO. His duties include investigating crimes that happen in the county, including inmate deaths in the SCJ.

46.     Captain Glynndara Tucker ("Cpt. Tucker"), not named as a Defendant, is employed by the SCSO as administrator of the SCJ. She was hired in 2004 and has been in that position since 2010.

-13-

47.     Lieutenant Michael S. Stephens ("Lt. Stephens") is employed by the SCSO, and for the past four years, has served as the head of court security. He is also responsible for overseeing prisoner transport and certain other SCJ-related matters.

**B.     Corrections Officers**

48.     Defendant Sgt. Brittany Brown was employed by the SCSO as a Corrections Officer at SCJ in July 2016. She worked the night shift (6:00 p.m. to 6:00 a.m.) as a shift supervisor and officer-in-charge.

49.     Defendant Ronald L. Johnson ("Officer Johnson") was employed by the SCSO as a Corrections Officer at the SCJ in July 2016 and is currently employed by the SCSO as a patrol deputy.

50.     Defendant Amy Nicely (Lay) ("Officer Nicely") was employed by the SCSO as a Corrections Officer and shift supervisor at the SCJ in July 2016. She knew Mr. Pemberton informally as an acquaintance of his mother and brother.

51.     Defendant Sgt. Shane Mason was employed by the SCSO as a Corrections Officer from November 2010 to January 2019. He was a shift supervisor.

52.     Defendant Sgt. Derek Phillips was employed by the SCSO as a Corrections Officer and at the SCJ during July 2016. He was a shift supervisor.[5]

53.     Tiffany Michelle Byrge ("Officer Byrge"), not a Defendant herein, was employed by the SCSO as a Corrections Officer at the SCJ and was an officer-in-charge in July 2016.

54.     David Dysarczyk ("Officer Dysarczyk"), not a Defendant herein, was employed by the SCSO as a Corrections Officer at the SCJ for approximately eight months, including July 2016.

---

[5]The Defendants who are identified as "Corrections Officers" are hereinafter referred to as the "Corrections Officer Defendants."

-14-

55. Cammie Nicole Mason ("Officer Cammie Mason"), not a Defendant herein, was employed by the SCSO as a Corrections Officer at the SCJ in July 2016 and worked the day shift (6:00 a.m. to 6:00 p.m.). She worked at SCJ for approximately three years, quitting in February 2017.

56. Randolph Mason ("Officer Randolph Mason"), not a Defendant herein, was employed by the SCSO as a Corrections Officer at the SCJ for approximately two years, including July 2016.

57. Lisa Terry ("Officer Terry"), not a Defendant herein, was employed by the SCSO as a Corrections Officer at SCJ in July 2016. Terry is the mother of Nurse Massengale.

58. Donny M. Washam ("Officer Washam"), not a Defendant herein, was a employed by the SCSO as a Corrections Officer at the SCJ from June 2016 until May 2017, when he quit for medical reasons.[6] Washam also attended high school with Mr. Pemberton.

**C.    ACH and ACH Personnel**

59. Defendant ACH is a private jail medical services company who contracts to provide on-site medical services to jails.

60. Defendant Dr. Edward Capparelli was an employee of ACH, who provided medical services to inmates medical services to inmates at the SCJ.

61. Defendant Nurse Massengale was a license practical nurse ("LPN"), and was employed by Advanced Correctional Healthcare ("ACH").[7]

---

[6]Many correctional officers have quit or resigned from the SCJ since Mr. Pemberton's death, including Sgt. Brown, Jeremy Silcox, Officer Terry, Joshua Phillips, Officer Phillips, Erian Washam, Officer Mason, Officer Washam, Twayana Mounce, and Cindy Bertram.

[7]Where referred to collectively, ACH, Dr. Capparelli, and Nurse Massengale are referred to as "the ACH Defendants."

-15-

### D. EMTs and Medical Personnel

62. Dr. Darinka Mileusnic-Polchan ("Dr. Mileusnic") is Chief Medical Examiner for Knox County, Tennessee, and performed the autopsy on Mr. Pemberton.

63. William Rick Russ ("EMT Russ") and Christopher Ray Wilson ("EMT Wilson") were Emergency Medical Technicians ("EMTs") who responded to the 911 call from the SCJ after Mr. Pemberton was found unconscious on July 20, 2016.

### E. Trusties and Inmates

64. Inmates Daniel Clark ("Trusty Clark") and James Brinker ("Trusty Brinker") were trusties at the SCJ in July 2016. Part of their responsibilities included cleaning, laundry, and serving food. Inmate John Coffee ("Trusty Coffee") was also a trusty at the SCJ in July 2016.

65. Inmate James R. Kilgore ("Inmate Kilgore") was incarcerated in the SCJ from July 15, 2016 to October 5, 2016 on a misdemeanor charge.

66. Inmate Michael S. Lay ("Inmate Lay") was incarcerated in the SCJ in July 2016.

67. Inmate Jeffrey Scott Mills ("Inmate Mills") was incarcerated in the SCJ in July 2016. He had grown up with Mr. Pemberton and saw him twice during Mills's time in jail.

68. Inmate Michael A. Muse ("Inmate Muse") was incarcerated in the SCJ in July 2016.

69. Inmate Jesse D. Perry ("Inmate Perry") was a cell-mate of Mr. Pemberton during part of Mr. Pemberton's incarceration in July 2016.

70. Inmate Joseph Sexton ("Inmate Sexton") was incarcerated at SCJ in July 2016 and was housed in E-Pod with Mr. Pemberton for at least part of Mr. Pemberton's incarceration.

-16-

71. Inmate Christopher L. Chambers ("Inmate Chambers") was incarcerated in the SCJ in July 2016 and was housed in E-Pod with Mr. Pemberton for at least part of Mr. Pemberton's incarceration.

72. Inmate Church P. Pemberton ("Inmate Church Pemberton"), a cousin of Mr. Pemberton's, was incarcerated in the SCJ and housed for part of the time with Mr. Pemberton, and assisted him as much as possible.

**F.     Other Law Enforcement Personnel**

73. Keith E. Hawkins ("Dep. Hawkins") was a SCSO Deputy Sheriff in July 2016 who followed the EMTs into the booking area of the SCJ on the night Mr. Pemberton was taken to the hospital.

**G.     Pemberton Family and Friends**

74. Donna Jean Sexton-Pemberton ("Ms. Sexton-Pemberton") was Mr. Pemberton's mother and was in communication with SCJ Corrections Officers on a daily basis to check on her son. She was also the original personal representative of Mr. Pemberton's Estate and filed the original complaint against the Defendants on July 20, 2017. She died in June 2019.

75. Scott Allen Pemberton ("Scott Pemberton") was Mr. Pemberton's brother and is the new Court-appointed personal representative of his brother's estate, the Plaintiff in this action.

76. Tina L. Webb ("Ms. Webb") was a friend of Mr. Pemberton. SCSO deputies arrested Mr. Pemberton on July 6, 2016 at her brother's residence. Webb visited Mr. Pemberton at SCJ.

## V.  FACTUAL ALLEGATIONS[8]

### A.    Mr. Pemberton Is Jailed and Exhibits Symptoms of a Serious Illness.

77.    On the afternoon of July 6, 2017, Mr. Pemberton was arrested on a Florida warrant for failure to pay child support. He was booked in the SCJ on a $200 bond. Mr. Pemberton has a 22-year old daughter who resides in Florida, where he was in arrears on his child support payments. However, upon information and belief, he had appeared before a judge about the delinquent child support payment and was informed he had several weeks to make a $400 payment before being incarcerated.

78.    When Mr. Pemberton was booked, he was in unremarkable medical condition, certainly able to walk on his own power.

79.    That same day, Mr. Pemberton's mother spoke with Sgt. Brown about her son's medical condition, informing her that he needed to take prescription medication for high blood pressure and blood clot issues. She provided Sgt. Brown with contact information for her son's local doctor and pharmacy. Sgt. Brown responded that she would ask Nurse Massengale – the jail nurse – if she would see Mr. Pemberton the next day, noting "sometimes the nurse would and sometimes the nurse would not."

80.    By July 8, 2016, Mr. Pemberton had begun to experience symptoms of a serious medical problem. He had entered the SCJ with a two-inch long deep cut on the top of his left foot,

---

[8]The allegations set forth in this Complaint come from multiple sources, including interviews with Mr. Pemberton's mother, informal written statements provided by inmates, a review of SCJ jail and medical files, incident reports, medical and autopsy records and reports from multiple sources, a statement by Dr. Mileusnic, and documented interviews of SCSO officials, Corrections Officers, Inmates, and medical professionals conducted by agents of the Federal Bureau of Investigation following Mr. Pemberton's death.

apparently the result of a poorly-fitting boot.[9] He was now experiencing unbearable pain in his left leg and informed Corrections Officers and Nurse Massengale that he believed he had a "serious medical problem."

81.     At the SCJ, medical help is supposedly available upon request. If an inmate becomes sick on the day shift, the jail nurse (Nurse Massengale) was purportedly available. On night shift, if it was a non-emergency, then the staff would call Dr. Capparelli. If it was an emergency, the staff would call for an ambulance. Nurse Massengale was allegedly available Monday through Friday. If an inmate needs medical assistance, she/he could call the control tower and fill out a medical request form. If Nurse Massengale was available, the inmate would be taken to her office. If it was on night shift, the staff would call Dr. Capparelli. If Dr. Capparelli was not available, other doctors were purportedly on the call list.

82.     The problem with this seemingly reasonable process was that, according to numerous Corrections Officers, Nurse Massengale was frequently not at work and even when she was, sick or injured inmates could not get in to see her. And according to Sgt. Brown, Dr. Capparelli would was only available about 50% of the time.

83.     Based on a SCJ medical log, Mr. Pemberton was seen by Nurse Massengale on July 8, 2016. She purportedly treated him for a "boil" on his upper left chest, about the size of a "half dollar" and "warm to the touch," setting up a 5-day regimen of Bactrim, an anti-bacterial drug.[10] The

_____

[9]Inmate Church Pemberton told FBI special agents that Mr. Pemberton was wearing new boots that had "rubbed a sore spot on his foot."

[10]Officer Washam, a veteran of the Air Force who had only recently been hired as a Corrections Officer, told FBI agents that the SCJ "journal log" existed, but that most of the things denoted in it should not be trusted. Similarly, Officer Mason informed FBI agents that the SCJ's log journal book is not 100% factual because some Corrections Officers would just write that a task was performed when in fact it hadn't been. Thus, whether Bactrim was actually

-19-

entry states that the boil had appeared five days earlier, on Sunday, July 3, 2016, three days before

Mr. Pemberton's arrest. Mr. Pemberton's blood pressure was elevated (163/104). Dr. Capparelli,

who never examined Mr. Pemberton, initialed the July 8 note on July 14, 2016.[11]

**B.      Mr. Pemberton Is Infected With MRSA – a Potentially Fatal Staph Bacteria.**

84.      Mr. Pemberton's ultimate medical problem was later discovered to be septic[12]

endocartitis caused by a bacterial infection, specifically, a staph infection: Methicillin-Resistant

Staphylococcus Aureus ("MRSA").

85.      According to the CDC, MRSA is a strain of staph bacteria that can cause infection.

[https://www.cdc.gov/mrsa/]. MRSA bacteria are resistant to the common antibiotics used to treat

staph infections. Bacteria may get into your skin or soft tissue through a cut, sore, or incision.[13]

---

dispensed or not is uncertain.

[11]There is further cause to believe these medical log entries are either false or have been tampered with, as they suggest Mr. Pemberton was taking a variety of medicines from July 12, 2016 through July 18, 2016. According to Dr. Mileusnic, Mr. Pemberton would have been unconscious and virtually comatose during the later days of his incarceration. It is, to say the least, hard to imagine him taking medicine during that time. Corrections Officers, as previously noted, have also suggested that medical entries are routinely tampered with to make it appear that duties have been performed when they have not.

[12]According to the Center for Disease Control ("CDC"), sepsis is a complication caused by the body's overwhelming and life-threatening response to infection.  It can lead to tissue damage, organ failure, and death.  Common infections, like skin infections, can lead to sepsis. An infection occurs when germs enter a person's body and multiply, causing illness, organ and tissue damage, or disease.  [https://www.cdc.gov/sepsis/index.html].  People with sepsis are treated in the hospital.  [*Id.*] Doctors treat sepsis with antibiotics as soon as possible. Many patients receive oxygen and intravenous (IV) fluids to maintain normal blood oxygen levels and blood pressure.  Other types of treatment, such as assisting breathing with a machine or kidney dialysis, may be necessary. Sometimes surgery is required to remove tissue damaged by the infection.  [https://www.cdc.gov/sepsis/index.html].

[13]Plaintiff is not alleging Mr. Pemberton contracted MRSA at the SCJ.  The Mayo Clinic states that "outbreaks of MRSA have occurred in military training camps, child care centers and

-20-

Because MRSA infections can resist the effects of many common antibiotics, they are difficult to treat. MRSA infections may affect the bloodstream, lungs, heart, bones, and joints. [http://www.mayoclinic.org/diseases-conditions/mrsa/basics/complications/con-20024479]. MRSA does, however, respond to certain antibiotics, and in some cases, antibiotics may not be necessary.[14]

### C. Each Hour, Mr. Pemberton's Medical Condition Was Getting Progressively Worse.

86.     Initially, according to Trusty Brinker, Mr. Pemberton was housed in Detox Cell #1 in the booking area for approximately 24 hours. He was then moved to E-Pod, a general population cell. He remained in E-Pod for approximately three or four days, before he was temporarily moved back to Detox Cell #1. While Mr. Pemberton was back in Detox Cell #1, Trusty Brinker

---

jails." [http://www.mayoclinic.org/diseases-conditions/mrsa/basics/risk-factors/con-20024479]. According to www.drugs.com, risks for MRSA are increased by:

- Touching the infected skin of someone who has MRSA;

- Living in the same household as someone with MRSA;

- History of MRSA infection;

- Use of personal items such as towels, razors, or clothes of someone with MRSA;

- Touching items such as doorknobs that have MRSA bacteria on it;

- Being in crowded places where germs can be spread such as hospitals, daycare facilities, or locker rooms;

- Taking antibiotics frequently, stopping antibiotics, or missing doses of antibiotics.

[https://www.drugs.com/cg/mrsa-methicillin-resistant-staphylococcus-aureus.html].

[14]For example, according to The Mayo Clinic, doctors may drain a superficial abscess caused by MRSA rather than treat the infection with drugs. [http://www.mayoclinic.org/diseases-conditions/mrsa/basics/treatment/con-20024479].

remembered him urinating on the floor and Trusty Clark cleaning it up. During this time, Trusty Brinker assisted Mr. Pemberton to the shower at least twice, because Mr. Pemberton was too weak to make it on his own. Trusty Brinker believed that Mr. Pemberton was having medical issues that affected his depth perception and equilibrium, as he was having a difficult standing or walking.

87.      Sepsis is a really grave condition that produces very significant symptoms and signs. As his condition – and the pain caused by it – worsened, Mr. Pemberton began complaining repeatedly about severe pain and swelling in his left foot and leg to Sgt. Brown, Sgt. Phillips, and Sgt. Mason, and Officers Johnson, Nicely, Boshears, and any other Corrections Officer he saw. He also complained to Nurse Massengale.

88.      Within a couple of days, Mr. Pemberton's leg was hurting so bad that he was repeatedly hitting the "call" button in his cell to summon officers to complain about his leg, screaming for help. Other inmates also began calling to get Mr. Pemberton "help."

89.      Early in his incarceration, while Mr. Pemberton was being housed in E-Pod, Officer Washam, who had just been hired the previous month after serving in the United States Air Force, recalled seeing him lying on a sleeping mat. Several inmates informed Officer Washam that Mr. Pemberton was "badly sick" and needed to see a doctor. To his credit, Officer Washam told his supervisor, either Sgt. Mason or Joe Byrge, that Mr. Pemberton was sickly and that he needed medical assistance, but nothing was done about it.

-22-

**D. "He Was Very Sick. He Was Very Very Sick."**

90.      By this time, the infection had likely spread to other organs of Mr. Pemberton's body. Still, he was given no medical treatment for the staph infection. He was complaining of a fever, his legs were weak, and he had no appetite. Dr. Mileusnic, after examining Mr. Pemberton, stated that during this period, "he was very sick. He was very very sick."

91.      Mr. Pemberton was displaying symptoms of septicemia, *i.e.*, body aches, spikes in body temperature, shivering, fever, dizziness, low blood pressure, sweats/chills, headaches, and fatigue. He began having more difficulty walking without assistance. Eventually, he was unable to make it to the door of his cell to retrieve food or medicine. Because he could not move on his own, while he was housed in E-Pod, other inmates assisted him, *e.g.*, getting his food tray, getting to and from the toilet and shower.

**E. Corrections Officers Move Mr. Pemberton to "the Hole" In Order to Not Have to Deal with Him.**

92.      At this point, still within his first week of incarceration, supervisors, including, upon information and belief, Sgt. Brown and Sgt. Mason, as well as Nurse Massengale,[15] directed that Mr. Pemberton be moved to Holding Cell #1 near the sally-port, known as "the hole," an isolation cell. At least two inmates (Chambers and Church Pemberton) made statements to FBI agents indicating that Sgt. Mason had himself physically carried Mr. Pemberton from E- Pod to Holding Cell #1, near the sally-port.

93.      The new cell was the last place Mr. Pemberton needed to be at the time. Officer Washam told FBI agents that this particular cell was "the worst place" to house an inmate who

---

[15]It appears LPNs are the first line of treatment at ACH contracted SCJs. The nurses periodically telephone the supervising physicians for approval and instructions.

needed to be monitored, as the inmate cannot be heard or seen from the booking area. Similarly, Officer Tiffany Byrge told FBI agents that she did not understand why Mr. Pemberton was moved from a Detox Cell in the booking area to Holding Cell #1 near the sally port; because inmates who needed to monitored more closely were always placed in the booking area. Officer Mason described the cell near the sally-port area as the "out of sight out of mind cell," where an inmate is placed when officers do not want to deal with him.

94.     While in "the hole," Mr. Pemberton – in immense pain and suffering an unusually high fever due to the worsening infection that by now had spread to other parts of his body – continued to beg for someone to help him.

**F.     Inmates Describe Mr. Pemberton As "Getting Around Like a 90-Year Old Man."**

95.     Other inmates provided statements to Mr. Pemberton's mother or FBI agents describing Mr. Pemberton's condition and situation early on during his incarceration:

- he was "a very sick man;"

- "people had to help him get around in and out of shower;"

- "he was getting around like a 90-year old man and when they came in the second time to get him they had to pretty much carry him out;"

- "could not even walk on his own to the restroom/showers" or even to "the POD door to receive meds and ask for help;"

- one day, Mr. Pemberton "hit the button and asked for help and they came back here laughing and making fun of him;" and

- another time, Sgt. Mason, who had actual knowledge of Mr. Pemberton's devolving medical condition (he knew Mr. Pemberton could no longer walk on his own), had to "help Mr. Pemberton out of his bed." Sgt. Mason had another officer "roll" a restraint chair back to the cell and Sgt. Mason carried Mr. Pemberton to the cell door and put him in the restraint chair.

-24-

### G. Mr. Pemberton Received No Medical Treatment for the Staph Infection Spreading Through His Body.

96.     Through it all, Mr. Pemberton was never given medical attention for the staph infection spreading through his body. Neither his foot nor his leg were ever examined by either Nurse Massengale or Dr. Capparelli, nor by any other nurse or physician. The staph infection was never treated and Mr. Pemberton was not seen or examined by a nurse or medical doctor or taken to a hospital for this serious condition until he was unconscious, and likely brain-dead.

97.     Medical records by physicians who subsequently treated Mr. Pemberton on July 20, 2017, statements by Dr. Mileusnic, and lab results all make it very clear that Mr. Pemberton's staph infection was not treated during the length of his incarceration.

98.     The moment Mr. Pemberton exhibited symptoms of a staph infection, someone should have stepped up and insured that he was given effective antibiotics. No one did this.

### H. "It Got to Where He Couldn't Do Anything"

99.     After about a week, Corrections Officers brought Mr. Pemberton back from "the hole." He "quit eating and was complaining about his leg," according to inmates. He still could not walk without assistance. Inmate Lay and Mr. Pemberton had to appear in court at the same time on delinquent child support charges and Mr. Pemberton could barely walk. Inmate Lay asked a Corrections Officer if he could use the restraint chair to wheel Mr. Pemberton into court. The officer said "no," so Inmate Lay helped Mr. Pemberton into court by holding him under his armpits.

100.     Mr. Pemberton's friend, Ms. Webb, visited him about five to seven days after he was jailed. Mr. Pemberton said he wanted to see a nurse or a doctor because he was not feeling well and something was wrong with him. Mr. Pemberton told Ms. Webb that his left arm was numb and tingling down to his fingers, his balance and depth perception were off, and he was seeing black

-25-

spots. Mr. Pemberton said he had told the nurse about these symptoms, but all she did was give him a couple of Tylenol and have him moved to a Holding Cell up front.

101.    Ms. Webb also visited Mr. Pemberton on July 14, 2016. Their conversation centered on him not feeling well. He reiterated that he needed to see a doctor. Mr. Pemberton was slumped over the entire time and apologized to Ms. Webb after just 15 minutes, telling her he needed to go lie down. Three days later, Ms. Webb visited again. Mr. Pemberton was again slumped over and, after just ten minutes, told her he wanted to go lie down.

102.    Around this time, inmates say that "it got to where he couldn't do anything." But he still kept begging for help. Because Mr. Pemberton's constant pleas for help were "disruptive," Sgt. Brown told Officer Johnson to move Mr. Pemberton to Holding Cell #1 near the sally-port, where he would not be monitored by officers on the floor.

**I.    Mr. Pemberton "Begged for Medical Attention the Whole Time He Was There."**

103.    According to several inmates, Mr. Pemberton "begged for medical attention the whole time he was there [in the SCJ]."

104.    Inmate Kilgore was housed in Detox Cell #2 during his first few days, while Mr. Pemberton was in Detox Cell #1, next door. He told FBI agents that when he first got to Detox Cell #2, he heard a man, who he later discovered to be Mr. Pemberton, yelling for help. Eventually, two Corrections Officers, one of which was Sgt. Brown, told Mr. Pemberton to "shut up" or he would be tased.

105.    Inmate Mills told FBI agents that he saw Mr. Pemberton twice during his (Mills's) time in the SCJ. The first time was about a week before Mr. Pemberton died, as Mills was leaving for work. Mr. Pemberton was sitting in a restraint chair complaining to Sgt. Brown that his head hurt

-26-

badly. The second time was one evening when Inmate Mills was returning from work and Mr. Pemberton was in the booking area and two Corrections Officers were holding him up by his armpits and dragging him to the Holding Cell.

106. By the last few days of his life, Mr. Pemberton was an invalid. He could not walk, get out of bed, eat, or go to the restroom or the shower without being carried. As Mr. Pemberton's organs began to shut down, he lost control of his bodily functions, inevitably urinating and defecating on himself, and begged Corrections Officers to take him to the showers to get "cleaned up." That too, they repeatedly refused to do.

**J. As the MRSA Infection Began Causing Multiple-Organ Failure and Likely Entered His Brain, Corrections Officers and Medical Staff Failed to Help Him**

107. It was, as Dr. Mileusnic described it, a "wicked infection," requiring hospitalization and IV-antibiotics. Still, while Mr. Pemberton's jail medical file shows that he saw Nurse Massengale on July 8, 2016, according to a statement given by Cpt. Tucker to FBI agents, there is no medical documentation indicating Mr. Pemberton saw either a nurse or a doctor after that date. Thus, he was not medically examined by anyone over the last eleven days of his life.

108. On July 16, 2016, Sgt. Mason learned from inmates in E-Pod that Mr. Pemberton was sick. The inmates used the pod's speaker box to let the control tower know that Mr. Pemberton needed assistance. Sgt. Mason proceeded to E-Pod to check on Mr. Pemberton. When Sgt. Mason arrived at E-Pod, he observed that Mr. Pemberton was sweating heavily and looked sickly. Mr. Pemberton was unable to stand on his own; but told Sgt. Mason that he did not feel good. Sgt. Mason thought Mr. Pemberton could be detoxing, although, by then, he had been in jail for ten

-27-

days.[16] As Dr. Mileusnic observed, if detoxification is "not getting better, that would be an indication that something else might be happening . . . Even a nurse would notice after 7-10 days that Pemberton wasn't detoxing if they had checked on him regularly."

109.    Sgt. Mason moved Mr. Pemberton to the booking area and had his vitals taken. He then called Dr. Capparelli and reported Mr. Pemberton's vitals and other symptoms, *i.e.*, he was sweating profusely and could not walk on his own. Dr. Capparelli said that Mr. Pemberton's "blood sugar" was likely low and told Sgt. Mason to keep him in the booking area for observation until he could see the nurse two days from then. Over the weekend, Sgt. Mason recalled that Mr. Pemberton was clearly sick, vomiting several times.

110.    By Monday evening, July 18, 2016, an inmate heard a Corrections Officer, upon information and belief, Sgt. Phillips, "yelling to try and wake up" Mr. Pemberton. Corrections Officers called 911. According to EMTs and an inmate who overheard the conversation, the EMTs

---

[16]According to Dr. Mileusnic, a person detoxing from opioids or experiencing withdrawal would typically have intense physical symptoms lasting one to five days. After day six and beyond the person would typically not have many noteworthy physical symptoms. By day ten to fourteen, the person typically would not have any physical withdrawal symptoms. For a person detoxing in jail, he/she should be closely monitored for any medical emergencies, particularly during the first week of dextoxification. Throughout Mr. Pemberton's incarceration, if he had been monitored appropriately by medical personnel, they should have identified his symptoms and rendered medical assistance to him.

-28-

informed Sgt. Brown that Mr. Pemberton's condition required immediate hospitalization. But Sgt. Brown *refused to allow EMTs to transport Mr. Pemberton to a hospital.*[17] And so, he was left in "the hole," the staph infection continuing its migration through his body.[18]

111.    By Tuesday evening, July 19, 2016, an inmate coming into the SCJ heard Mr. Pemberton "yelling for help." The Corrections Officer accompanying the inmate responded that it was "just some Xanax junkie." The inmate was in the booking area for "a good while" as Mr. Pemberton "screamed for help and nothing was done to help him."[19]

112.    Mr. Pemberton's brain abscess – a collection of pus that develops in the brain due to an infection – would have started small and grew larger over time. At this point, according to Dr. Mileusnic, about six hours prior to Mr. Pemberton's body shutting down, any person observing his behavior should have noticed several obvious symptoms and realized that he needed medical attention immediately. He would be screaming, disoriented, confused, and in a lot of pain. He could not have walked to the shower or even talked.

---

[17]Sgt. Brown did not even take the situation seriously enough to inform Cpt. Tucker, the jail administrator, that EMTs were called for Mr. Pemberton prior to him going to the hospital on July 20, 2016, according to Cpt. Tucker's statement to FBI agents.

[18]Inmate Kilgore told FBI agents that EMTs had been at the SCJ and looked at Mr. Pemberton prior to the day he was taken to the hospital. Inmate Kilgore said he heard Sgt. Brown tell EMTs that Mr. Pemberton was "okay," so they left.

[19]Officer Mason worked the day shift (6:00 a.m. to 6:00 p.m.) during Mr. Pemberton's incarceration. She recalled that during a shift change, a night-shift Corrections Officer briefed her and her shift supervisor that Mr. Pemberton had been moved from the booking area to the sally-port cell because he had been making "too much noise," *i.e.*, beating on the door and making frequent requests for assistance. Sgt. Brown was the night shift supervisor who ordered the move. Officer Mason told Sgt. Brown that she did not agree with moving Mr. Pemberton to the sally port cell because the cell was not monitored by officers in the booking area.

113.    Several inmates repeated this scenario, *e.g.*, Mr. Pemberton "repeatedly asked for medical attention which he was denied" and "asked over and over for medical attention" but "was denied." At no time did Corrections Officers or medical personnel provide Mr. Pemberton with medical care, medicine, or appropriately effective antibiotic or antibacterial medicine for his condition.

### K.    Mr. Pemberton's Last Two Nights Culminate in Him Being Found Lying Naked and Unconscious in His Cell in His Own Urine and Excrement.

114.    According to incident reports, including reports by Sgt. Brown and Sgt. Phillips, and Officers Johnson, Nicely, Boshears, and an unidentified officer, at about 1:00 a.m. on Wednesday, July 20, 2016, Sgt. Phillips purportedly went to complete an "hourly security check" on Mr. Pemberton. According to those reports, Sgt. Phillips found Mr. Pemberton lying on his back on the cell floor "with urine and human fecies under him."

115.    Also according to the reports, Mr. Pemberton was "conscious but not responsive." Instead of calling E-911, Sgt. Brown instructed Trusties Clark and Brinker to help Mr. Pemberton to the shower "to wash himself."[20]

116.    In contrast to the Corrections Officers' self-serving descriptions of events, Trusty Clark told the FBI a much different version of what unfolded in Mr. Pemberton's last two nights alive. Clark told FBI agents that he was in the booking area on July 18, 2016, cleaning, when the tower called and told Sgt. Mason that Mr. Pemberton was "shaking and sweating and needed medical assistance." He accompanied Sgt. Mason to Mr. Pemberton's cell. Mr. Pemberton told Sgt.

---

[20]According to one inmate, Sgt. Brown told officers to "bring him [Mr. Pemberton] out [of his cell]." "They carried him out" and the inmate saw that he was "stiff" and his eyes were "glazed over." Sgt. Brown told them to "clean him up and put him in "the chair" used for "problem inmates." EMTs were not called until Mr. Pemberton had been cleaned up and placed in the restraint chair.

-30-

Mason that he "couldn't stop shaking and sweating" and that he had a headache. Sgt. Mason removed Mr. Pemberton from his cell and placed him in a segregation cell near booking, where he was supposed to stay until a nurse could see him.[21]

117.     After the move, Trusty Clark heard Mr. Pemberton yelling for help, but the Corrections Officers ignored him. When he asked the officers what Mr. Pemberton was yelling about, they told him that he wanted a shower. The officers, however, did not want to be bothered, as they were playing video games on the computer.[22] Trusty Clark came back later and Mr. Pemberton was still yelling for help. The officers were laughing at him. Clark asked Officer Nicely if they had called the doctor. She said the doctor said that nothing was wrong with Mr. Pemberton, as he was either "faking or detoxing."

118.     The following day, July 19, 2016, at 6:00 p.m., Trusty Clark went to the booking area and Mr. Pemberton's cell was open and his belongings were gone. The Corrections Officers told Clark that they had moved Mr. Pemberton to the sally-port area because they "didn't want to hear him screaming." The officers told Clark to clean up the cell because Mr. Pemberton had urinated on himself. Clark cleaned up the cell, then went to the sally-port area to smoke. He stopped at the sally-port cell window where Mr. Pemberton had been placed and asked him why he had urinated on himself. Mr. Pemberton, who was lying on the floor in his underwear with his genitals exposed, told Clark he "couldn't help himself."

---

[21]This is confirmed by Inmate Perry, who told FBI agents that he and other inmates had "raised hell" with Corrections Officers to get Mr. Pemberton medical attention. Eventually, Nurse Massengale came by Mr. Pemberton's cell and asked, while laughing, "where's the guy that's supposedly sick?" She looked at Mr. Pemberton and left. Shortly thereafter, Sgt. Mason returned with Trusty Clark to remove Mr. Pemberton from his cell.

[22]This is consistent with what Officer Washam told FBI agents, as he stated that Mr. Pemberton "begged for help," and this annoyed some Corrections Officers.

-31-

119. Later that night, July 19, 2016, Trusty Clark returned to the sally-port area and saw Mr. Pemberton still lying on the floor. After Mr. Pemberton asked Clark why no one was helping him, Clark told Sgt. Phillips about it. Officer Nicely, who was also present, said, "Fuck him, he faking."

120. Clark checked on Mr. Pemberton again later on that night and noticed a smell emanating from his cell. He saw that Mr. Pemberton was lying "dead still" on the floor, his eyes glazed over, open, but not moving. Clark told Sgt. Phillips, who put on a pair of gloves and saw that Mr. Pemberton had defecated on himself. Sgt. Phillips told Clark to clean him up and Clark woke Trusty Brinker to help him.

121. Sgt. Brown told the men to drag Mr. Pemberton's lifeless body to the showers to clean him up. Mr. Pemberton was barely breathing and unresponsive, taking raspy choking breaths about every ten seconds. They dragged his lifeless body to the shower. Brinker held him, while Clark washed him. According to Brinker, it took about ten minutes for them to clean Mr. Pemberton.

122. Sgt. Brown gave Clark an ammonia stick to put under Mr. Pemberton's nose, but there was no response. Sgt. Brown then told Clark to put a diaper and pants on Mr. Pemberton. Clark dressed him and Sgt. Brown told Clark to put him in a restraint chair. He was then told to put a shirt on him.

123. At this point, Clark told Sgt. Brown, "I told you hours ago to check on him." Sgt. Brown responded, "put it on your skin if anyone asked you we went back there the first time you asked," and made both Trusties swear they would say that if anyone asked.[23]

---

[23]Both Brinker and Clark said they were shook up about Mr. Pemberton's fate. Brinker told FBI agents that he recalled Sgt. Brown telling Clark, "okay, we went back to check on Pemberton the first time he hollered for help." When Clark responded that this had not happened, Sgt. Brown cut him off and reiterated, "we went back there the first time."

124.    During this period, as Mr. Pemberton was being cleaned up, Corrections Officers made at least four telephone calls to supervisors for instructions. Eventually, Officer Boshears called Dr. Capparelli and handed the phone to Sgt. Brown. Dr. Capparelli reportedly instructed Sgt. Brown to take Mr. Pemberton to the hospital.[24]

125.    The fact was that Mr. Pemberton could do nothing for himself, as his brain had by now disintegrated due to the staph infection that had ravaged his entire body. Only then did Sgt. Brown have a call made to 911.

126.    SCSO Deputy Keith E. Hawkins ("Dep. Hawkins") and Officer Byrge saw the ambulance heading to the SCJ. Dep. Hawkins came into the booking area and noticed a man seated in the restraint chair. It was Mr. Pemberton. Sgt. Brown said he was sick. Dep. Hawkins knew at that moment that Mr. Pemberton was more than sick and told Officer Byrge that he was dead.

127.    EMTs Wilson and Russ responded to the call at 1:16 a.m. They described to FBI agents that upon their arrival at the SCJ, Mr. Pemberton was seated in the restraint chair unrestrained and, according to EMT Russ, was "blue as a fish hook," meaning he was hypoxic, and was not breathing at all. They began stabilizing Mr. Pemberton for transport to the ER.

128.    Medical records from North Knoxville Medical Center ("NKMC") show that EMTs performed CPR and regained a pulse. EMTs also administered Nalaxone, believing, because of false representations of Corrections Officers, that Mr. Pemberton had overdosed on opioids. Unable to breathe on his own, Mr. Pemberton was placed on a ventilator.

---

[24]According to another Correction Officer's report, Dr. Capparelli stated that "since inmate Pemberton had been doing this in the past and since he was escalating we would have to take him to the emergency room."

-33-

129.    Sgt. Brown called Cpt. Tucker, the jail administrator, at home at about 4:00 a.m. and, according to what Cpt. Tucker reported to FBI agents, led Cpt. Tucker to believe that Mr. Pemberton was "alive, alert, breathing but not talking." Cpt. Tucker later learned that even as an unconscious Mr. Pemberton sat in a restraint chair, Sgt. Brown had wanted to transport him to the hospital using a patrol cruiser instead of calling 911 for an ambulance.

**L.      Mr. Pemberton is Treated at NKMC and Transferred**

130.    Mr. Pemberton arrived at the NKMC ER in Knoxville on July 20, 2016 at 2:34 a.m. The ER medical staff immediately recognized his condition as "critical." The initial diagnosis, from Dr. Travis Fawver, was that Mr. Pemberton had suffered an "intra-cranial hemorrhage, intra-cranial bleed, subdural hypotension, and cardiac arrest."

131.    Medical records from NKMC indicate that Dr. Fawver was accurately told by Sgt. Phillips that Mr. Pemberton "was found unresponsive in his SCJ cell and had urinated and defecated on himself." However, Sgt. Phillips also told Dr. Fawver that Mr. Pemberton "was alert and oriented 15 minutes before patient was found." As Mr. Pemberton was likely brain-dead at that time, Sgt. Phillips' statement was clearly false.

132.    Given this misleading information, doctors at NKMC determined that Mr. Pemberton required a higher level of care and ordered a transfer to UTMC.

133.    Laboratory results from tests performed at NKMC of Mr. Pemberton's blood and tissue subsequently revealed "gram positive cocci, in clusters," and staphylococcus aureus. A computed tomography ("CT") of Mr. Pemberton's brain revealed a

-34-

"4.1 x 3.5 cm hemorrhagic lesion within the right cerebellum, w/fluid level. A 2nd 3.1 x 3.1 cm hemorrhagic lesion is present within the left occipital lobe, as well as "hemorrhagic masses within the right cerebellar hemisphere and left occipital lobe the right cerebellar lesion appears to be actively bleeding."

**M.** **On Arrival at UTMC, Mr. Pemberton Is Likely Brain-Dead, But Physicians Attempt to Save Him Via Brain Surgery.**

134.    By the time Mr. Pemberton arrived at UTMC via Rural Metro Ambulance Services, the medical staff feared that he was "already brain dead."

135.    Doctors originally believed the bleeding in Mr. Pemberton's brain could have been trauma-related. Dr. Christopher Gallati, a neurosurgeon at UTMC, performed a "suboccipital craniectomy for evacuation of posterior fossa hemorrhage (to try to decompress brain stem)."

136.    Despite life-saving efforts by UTMC physicians, it was ultimately determined that Mr. Pemberton was brain-dead. His family was informed, and at 3:28 p.m. on July 20, 2016, Dr. Jace Perkerson pronounced Mr. Pemberton's death and requested an autopsy.

**N.** **Autopsy Reveals MRSA Had Entered Mr. Pemberton's Brain, Heart, and Multiple Other Organs.**

137.    An autopsy was performed on July 22, 2016 by Dr. Mileusnic, the Chief Medical Examiner for Knox County. Dr. Mileusnic concluded that Mr. Pemberton had died of septic endocarditis.  Among other conditions, she found:

- ■ "grossly visible pattern of necrosis;"[25]

- ■ "brain abscess;"

- ■ "left foot abscess with deep subcutaneous necrosis;"

_____

[25]According to various medical journal Necrosis – the death of most or all of the cells in an organ or tissue due to disease, injury, or failure of the blood supply.

-35-

■ massive tissue abscesses in multiple organs and tissues, "including septic myocarditis with multiple abscess formations. All sampled abscesses reveal central necrosis with multiple massive bacterial colonies."

138.    According to Dr. Mileusnic, the staph infection began in Mr. Pemberton's left foot,

moved up his left leg, and ultimately, migrated into his vital organs, including his brain.

139.    The infection went to his heart, and septal abscesses were found in Mr. Pemberton's

liver, kidneys, spleen, and pancreas. Dr. Mileusnic's report reveals that the staph infection had

disintegrated part of Mr. Pemberton's brain, leaving "massive bacterial colonies."

140.    Obviously, this condition did not occur overnight. Rather, as Dr. Mileusnic said, "it

would have taken days to get that amount of infection all over the body."[26]

141.    Dr. Mileusnic stated that:

> this particular infection, and especially what I'm seeing in the body when I sampled organs and tissues and especially the involved valve, and it involved – you know, whether it be the skin ulcer and then again all the organs that had abscesses in them, I mean the spread was so overwhelming, and the bacterial seeding throughout the body was so overwhelming that that's not something that is going to happen in minutes and cause one to just drop dead. I mean, that's going to be progression of the symptoms and signs that it's going to take some time, especially, again, going back to presentation of lack of balance or imbalance or problem walking and a gait in general. That's something that, as I recall, was discussed days in advance which is telling me that the brain is involved.

[Mileusnic Statement, at 47].

---

[26]As for whether MRSA had its origins in Mr. Pemberton's past drug use, Dr. Mileusnic's autopsy report seems to make it very clear that there was no abscess associated with needle marks on his body.

142.    Dr. Mileusnic also stated that this:

> was actually one of the worst MRSA infections that I've seen. And the reason why I'm saying that is the bacterial colonization throughout his body was so overwhelming. Sometimes you get septic picture and the individual can die and you can see bacterial colonies in the spleen or focally in the heart, but he was pretty much a petri dish of bacteria everywhere. I mean, it was so overwhelming. It was one of the worst that I've seen, and especially because his brain was involved to such a degree that it's one of the worst that I've seen.
>
> By the time Pemberton is hospitalized, Mr. Pemberton is already brain dead and he's brain dead because essentially the brain, back part of the brain pretty much disintegrated due to infection and then led to breakdown of the circulation on the blood vessels that led to hemorrhage that led to essentially overwhelming hemorrhagic stroke. So whatever is in the brain was there when he, when he was seen or admitted . . . .
>
> all of those tissues and organs show not just bacterial colonies but abscesses and infarcts that are already in the process of organization and healing which means they've been there for days.
>
> Whatever I'm seeing in the organs and tissues, it had been there for days. It's not something that's going to happen within the last 30 hours. It's impossible.

[Mileusnic Statement, at 51].

### O.    Inmate Statements Concerning Mr. Pemberton's Medical Condition and Corrections Officers' Knowledge of It Make it Clear His Condition Was Known.

143.    Numerous individuals who were inmates at the SCJ during the period when Mr. Pemberton was incarcerated there have come forward to state their knowledge about the circumstances surrounding his death. Their statements, combined with statements by Corrections Officers, jail and medical files, medical records, and Dr. Mileusnic's own statement describing her autopsy of Mr. Pemberton's body, leave little, if any, doubt that Mr. Pemberton's serious illness was ignored. They include:

-37-

■ Inmate Chambers was housed in E-Pod at the SCJ with Mr. Pemberton for part of Mr. Pemberton's incarceration. He noticed that Mr. Pemberton was "sickly" and that he was getting even sicker over time. Inmate Chambers said Mr. Pemberton "was in bad shape," moving very slowly "like a 90-year old man." He also stated that the jail staff knew about Mr. Pemberton's medical condition because they moved him from E-Pod to a cell in the booking area, to be more closely monitored.

■ Inmate Church Pemberton told FBI agents that he had heard Mr. Pemberton (his cousin) complain to Corrections Officers and Nurse Massengale about his left knee and about a great pain moving from his left knee up to his chest.

■ Trusty Clark told FBI agents that about a week to ten days after Mr. Pemberton arrived at the SCJ, and approximately four days before he died, Mr. Pemberton had begged for medical help, but Corrections Officers ignored him and did not check on him.

■ Inmate Perry, another cell mate of Mr. Pemberton's, told FBI agents that Mr. Pemberton was vomiting repeatedly, unable to walk, use the toilet, or take a shower without assistance. As his condition worsened, Inmate Perry said that Mr. Pemberton continued to request medical attention, but his requests were ignored by Corrections Officers and Nurse Massengale.

■ Inmate Joseph Sexton was housed in E-Pod with Mr. Pemberton. He stated in an interview with FBI agents that Mr. Pemberton was fine when he first arrived, but his health deteriorated quickly to the point where he was not able to walk and shower without assistance. Eventually, Mr. Pemberton was unable to move from his bed without assistance. Inmate Sexton said that Mr. Pemberton had a noticeable sore on his foot.

Although Inmate Sexton and other inmates tried to get Corrections Officers to get Mr. Pemberton medical assistance, they would not help him and rarely even did their routine checks on inmates. Corrections Officers cursed at Mr. Pemberton, saying he was not sick, and Sgt. Brown and Officer Terry made fun of him and denied him any medical help. Inmate Sexton also stated that when several inmates informed Chief Deputy Silcox about Mr. Pemberton being sick, Chief Dep. Silcox stated that Mr. Pemberton was only "dope sick" and that he had "seen this 100 times" and Mr. Pemberton would be fine.

-38-

■ Trusty Coffee reported in an interview with FBI agents that he had observed an inmate ("Mr. Pemberton") in distress in a cell referred to as the "hole." The cell is secluded from the view of the staff, and was in an area where others could not hear him. Trusties Coffee and Clark, being escorted to the sally-port by Sgt. Phillips, passed by the cell and saw Mr. Pemberton lying partially on the mattress on the floor on his back, in boxer shorts, and with his penis hanging out. He was moaning and making incoherent sounds. Sgt. Phillips commented that the inmate was alright and was just "acting up."

■ Inmate Michael A. Muse ("Inmate Muse") – Inmate Muse told FBI agents that it was "obvious to anyone" that Mr. Pemberton was sick. The one day that Mr. Pemberton was in D-Pod, he was curled up in a ball on his bed and did not move.

### P. Corrections Officers Misrepresented and Concealed Information About the Circumstances Surrounding Mr. Pemberton's Medical Condition

144. After Mr. Pemberton was taken to the hospital, Cpt. Tucker was told by her Corrections Officers that Mr. Pemberton had been "hollering because he wanted time out of the cell." Sgt. Phillips had allegedly stopped by Mr. Pemberton's cell to let him know it would be a few minutes before he could let him out. Later, Sgt. Phillips supposedly returned to Mr. Pemberton's cell and discovered him lying on the cell floor, having defecated on himself. Dr. Capparelli was called. Mr. Pemberton showered and changed clothes, and EMTs arrived and transported him to the hospital. Much of this rendition appears to have been false, as, according to Dr. Mileusnic, by this point, Mr. Pemberton would not have been able to stand, walk, or, for that matter, talk, much less able to shower and dress himself.

-39-

145. Based on a timeline created from the incident reports provided by the SCSO, Dr. Mileusnic stated that at approximately 8:00 p.m. on July 19, 2016, Mr. Pemberton was lethargic and sweating. Between 8:00 p.m. and 10:00 p.m., he would have been unable to walk and become comatose; and by 1:03 a.m., when 911 was finally called, Mr. Pemberton would basically be dead.[27]

146. But the misrepresentation to Cpt. Tucker was just the beginning of the cover-up by Corrections Officers, one that was ultimately sanctioned by higher-ranking SCSO officials. For instance, several Corrections Officers made statements to physicians treating Mr. Pemberton (and later, to FBI agents) that indicate he was conscious, alert, lucid, and even talking minutes before he was purportedly found unconscious. For instance:

- Sgt. Phillips falsely informed medical staff at NKMC that Mr. Pemberton "was alert and oriented 15 minutes before" he was found;

- Sgt. Brown falsely stated that "[a]ll security checks conducted throughout the night were reported as normal, the inmate was breathing and lying on his mat during each check and had been asking for a shower;" and

- Officer Johnson falsely stated that he "saw two trustees escorting inmate Benny Shane Pemberton to the shower."

147. One unidentified Correction Officer wrote in a report that:

- at approximately 6:50 p.m., Mr. Pemberton "was lying on bed mat, he was responsive and asked Deputy Tanner Boshears for a shower;"

- Sgt. Brown "completed a security check in booking at approximately [7:26 p.m.] – inmate Pemberton again asked for a shower;"

---

[27]Moreover, according to Trusty Clark, it was he who found Mr. Pemberton unconscious, not Sgt. Phillips.

■ Officer Boshears "was checking on inmates and completing security check at approximately [7:55 p.m.] – we noticed he had urinated on himself. Inmate Pemberton was moved to holding 1 so we could clean his cell and because he had been yelling for an hour out through booking;"

■ at 8:26, Sgt. Brown "completed security check in booking – inmate lying on his mat-inmate breathing and conscious;" and

■ at approximately 11:57 p.m., Sgt. Brown "completed security check – inmate Pemberton was lying on his mat-looked at door and asked for the time and for an hour out."

148.    All of this, of course, was false, as Mr. Pemberton had suffered multiple organ failure by this point and his brain had more or less disintegrated from massive bacterial colonies that had invaded it. All of the statements by Corrections Officers were merely attempts to cover up their own deliberate indifference to Mr. Pemberton's medical condition.

149.    Similarly, Nurse Massengale stated that an antibiotic had been prescribed for Mr. Pemberton's "boil" on July 8, 2016. A medicine administration chart, initialed by no fewer than seven individuals, purportedly shows that he was given four different medicines up until the evening of July 18, 2016. This, of course, is implausible, considering that Mr. Pemberton was likely unconscious and unresponsive by July 18, 2016.

150.    The majority of these representations were false. In his condition, Mr. Pemberton would not have been "talking," "yelling," or "asking for a shower" minutes before 911 was called. It took a period of days for Mr. Pemberton's bodily functions and organs to shut down. Yet, Corrections Officers implausibly contend that an hour before being found, he "asked for the time" and was "alert and oriented" a mere *fifteen minutes* before being found.

151.    By the evening of Tuesday, July 19, 2016, Mr. Pemberton was physically unable to do any of the things these Corrections Officers say he did.

-41-

152.    According to Dr. Mileusnic, who performed the autopsy on Mr. Pemberton's body, the doctors who performed surgery on him at the University of Tennessee Medical Center likely would have not done so because it was futile; but were told misleading information by Corrections Officers who accompanied Mr. Pemberton about his medical condition.

**Q.    Scott County's Refusal to Discuss the Case or to Investigate the Circumstances Surrounding Mr. Pemberton's Death.**

153.    After her son's death, Mr. Pemberton's mother telephoned the SCJ and spoke to Sgt. Brown. Sgt. Brown told her that her son was found like that. When she called back a few days later, Sgt. Brown told her that nobody at the SCJ could talk to her about what had happened and that she needed to speak with Sheriff Phillips or Chief Deputy Silcox.

154.    Mr. Pemberton's mother had called the SCJ to check on her son the day after he was booked and was told by a Corrections Officer, "if he (Mr. Pemberton) needed to see a nurse, he saw the nurse, and if he needed medication, he got medication." And so, Ms. Sexton-Pemberton assumed her son was doing fine. She checked with officers about her son daily, either while she was at the SCJ on bail bonding business (on at least five occasions) or by telephone, and was told that he was doing fine. After her son's death, Lt. Stephens told Ms. Sexton-Pemberton that her son was "fine' every day "until 15 minutes before he went to the hospital," telling her he had talked with her son every single day.

155.    Days after Mr. Pemberton's death, his mother met with Chief Detective Lewallen and Detective Eric Newport. Detective Lewallen had the preliminary autopsy report from Dr. Mileusnic on his desk. He informed Mr. Pemberton's mother – as he tapped his fingers on the autopsy report – "right there's what happened to that boy! All of his problems were caused by his needle marks and

-42-

there will not be an investigation. If you don't like the answers you are getting here, hire and attorney."[28]

156.     Chief Detective Lewallen never conducted an investigation pertaining to Mr. Pemberton's death. Under the circumstances that Mr. Pemberton had died in the hospital and not in the SCJ, he felt it was unnecessary.

157.     Sheriff Phillips and Chief Deputy Silcox approved or condoned Detective Lewallen's decision not to investigate the circumstances surrounding Mr. Pemberton's death. Although a number of the Corrections Officers who interacted with Mr. Pemberton are no longer employed at the SCJ, none of them were terminated, suspended, disciplined, or otherwise reprimanded for their mistreatment of Mr. Pemberton.

158.     On August 24, 2016, Mr. Pemberton's mother made a formal written request for medical records to Scott County and ACH, requesting medical records or records regarding her son's incarceration, including information and documents concerning his medical treatment. Only ACH responded to her requests, albeit with incomplete responses.

159.     Similarly, after her son's death and after failing to receive any information from the SCSO, Mr. Pemberton's mother posted a request on social media (Facebook) asking anyone with information relating to her son's death to come forward with information. In response, Chief Deputy

---

[28]Cpt. Tucker, who oversees the jail, told FBI agents that she was not aware of any internal investigation into Mr. Pemberton's death by the SCSO. Indeed, Officer Dysarczyk also stated that he was not aware of any internal investigation conducted by the SCSO.

-43-

Silcox told Scott Pemberton that if his mother removed the Facebook post the SCSO would discuss what happened to her son during his confinement. Mr. Pemberton's mother took the post down, but no one at the SCSO ever discussed the case with her.[29]

## R. State Inspections Find Medical Care at SCJ Deficient

160.    The Tennessee Corrections Institute ("TCI")[30] inspected the SCJ in July 2015 and refused to certify it, concluding that among other deficiencies, Dr. Capparelli's medical protocol letter had expired, that ACH had not had its annual meeting with Sheriff Phillips, as required, that intake screenings to check for serious illnesses or wounds and to check for prescribed medication were not being completed consistently, that inmates were not consistently being informed of sick call or how to make grievances about medical care, that security checks were not being made regularly in contravention of policy and procedures or medical protocol.

161.    While a TCI inspection in August 2015 indicated that SCJ had cured the deficiencies, by May 19, 2016, TCI had again inspected the SCJ and a week later, issued a report decertifying the SCJ. The May 26, 2016 report disclosed that inmates being booked at SCJ were not being

_____

[29]About a week after Mr. Pemberton's death, Lt. Stephens called Inmate Church Pemberton into the booking area to explain that the jail staff had done everything they could to help his cousin. Church Pemberton told Lt. Stephens that he and other inmates had repeatedly asked Corrections Officers to help Mr. Pemberton. Lt. Stephens did nothing to investigate Inmate Church Pemberton's claims.

[30]Under the authority of Tenn. Code Ann. § 41-4-140, the TCI is required to establish minimum standards for adult local jails, lock-ups, workhouses and detention facilities in the state. The TCI's Board of Control establishes the standards to inspect and certify local correctional facilities. Inspections and re-inspections are conducted within the mandated time-frame to ensure compliance of all standards for the purpose of certification. TCI standards require that inmates undergo screenings and examinations at booking for medical conditions, prescribed medications, and suicidal tendencies. If an inmate remains incarcerated for two weeks, the standards require another detailed examination.

-44-

"consistently" screened for medical conditions, prescriptions, or suicide risks, as required by state standards. Nor were inmates being informed how they may seek medical help while incarcerated. In addition, a required medical protocol letter had expired and records – designed to prove that inmates had actually received medical care – were missing their required initials and signatures.

162. Although a subsequent TCI inspection on July 11, 2016 indicated that the SCJ had cured the prior deficencies, by August 2017, the SCJ once again failed the TCI inspection. That report found, among other deficiencies, that the SCJ was not performing inmate physicals within 14 days of intake, as required.

163. From all of this, it appears that at least once annually, the SCJ fails to meet state jail standards, leading to the inference that once-a-year, SCJ officials do whatever might be necessary to temporarily meet the minimum standards to obtain certification by TCI, then the rest of the year, such standards are not met, leading to decertification at the following inspection.

**S.     Scott County's Own Policy Requires an Actual Medical Evaluation**

164. Scott County has also developed a "Policy and Procedures Manual" for the SCJ. The manual notably provides that each inmate must receive a medical evaluation and screening at the time they are booked. Specifically, it provides that "[a]rriving detainees determined to be in need of critical or emergency medical, mental, or dental care will not be turned away from the facility." [Manual, at p. 218]. Inmates must be screened for, among other conditions, *obvious wounds*, illness, prescribed medications, and suicidal risk assessment. *Id*.

**T.     Similar Instances of Inadequate Medical Care and Severe Neglect at the SCJ in 2016-17.**

165. Around the same time of Mr. Pemberton's incarceration, other inmates at the SCJ also suffered from neglect and inadequate medical care. In July 2016, inmate Tammy Brawner left

the SCJ via ambulance, having suffered numerous seizures that a lawsuit contends she had been suffering for weeks. *Brawner, et al. v. Scott County, et al.*, No. 3:17-cv-00108-JRG-HBG, Doc. 8, at Page ID#: 89-118 (E.D. Tenn. March 31, 2017). According to her lawsuit, Ms. Brawner suffered permanent brain injuries due to inadequate medical care at the SCJ.

166.     According to her lawsuit, Ms. Brawner had been ordered by her doctor to take a series of anti-seizure drugs. After being jailed for showing up late for court in General Sessions Court on a drug charge in June 2016, Ms. Brawner was jailed.  She alleged the SCJ never provided her anti-seizure medicine, resulting in a series of seizures over the next week. She alleged corrections officers accused her of "faking" seizures and ignored her. Finally, her condition deteriorated to the extent she was hospitalized on July 7, 2016 (the day after Mr. Pemberton started his incarceration) and diagnosed with seizures. No one at the SCJ, however, informed hospital staff that Ms. Brawner had not received her medicine. She was stabilized and returned to SCJ with a prescription for a seizure drug.  A little over a week later (five days before Mr. Pemberton was found unconscious and died), Ms. Brawner left the SCJ via helicopter in route to a Knoxville hospital.

167.     Another lawsuit charges that Mr. Jesse Perry was booked into the SCJ soon after the failed July 2016 inspection and was placed in a pod of 40 inmates, one of whom claimed he had tuberculosis but said SCJ staff were ignoring his coughing. *Perry v. Scott County, et al.*, No. 3:17-cv-00234-TAV-HBG, Doc. 1, at Page ID#: 1-10 (E.D. Tenn.  June 1, 2017).  Mr. Perry did not have TB when he was booked, but  after being transferred from the SCJ to state prison a few months later, Mr. Perry alleges that he tested positive for TB.

-46-

168.    The three lawsuits – all alleging inadequate medical care in July 2016 and filed within a few months of each other – serve to highlight the lack of independent oversight of the quality of medical care provided by the Defendants.

**U.    The Pattern of Inadequate Medical Care and Deliberate Indifference to the Serious Medical Conditions of Inmates Continues at the SCJ.**

169.    Considering these three temporally-related incidents, one would think that ACH and Scott County would review the actions of all of the involved staff, policy, and procedures and take precautions to prevent similar incidents from occurring in the future. Indeed, ACH vows to do exactly that on its website:

> "In the rare event our team has made a mistake in patient care, we do the right thing by immediately taking ownership of the error and determining how we can remedy the injury and make the plaintiff whole. It's just the right thing to do. This type of analysis is performed for every single one of our lawsuits.  Once the plaintiff is made whole, our work doesn't stop. ***We treat lawsuits as opportunities to learn how we can do our jobs better. For each of the few settlements we have made, we have changed our company practices nationwide. Learning from our mistakes is probably why our insurance rates are substantially lower than that of our competitors.***"[31]

170.    Yet, nine months later, from April 30, 2017 to May 10, 2017, another Scott County inmate, Keesha Blevins, was treated by ACH and SCJ staff precisely as they had treated Ms. Brawner. Ms. Blevins alleges in her lawsuit that at her booking, she informed the staff that she had a long history of seizures requiring medication and provided a list of medications, including two anti-convulsant drugs. *Blevins v. Scott County, Tennessee et al.*, No. 3:17-cv-00348-TRM-CCS (E.D. Tenn. Aug. 10, 2017). Nevertheless, Ms. Blevins alleges that she was never provided with any of the medications that she had been taking daily for fifteen years, which "were medically necessary

---

[31]*See* https://www.advancedch.com/services/legal/.

-47-

to prevent a seizure." Not surprisingly, like Ms. Brawner, Ms. Blevins began suffering seizures, and, also like Ms. Brawner, Ms. Blevins' requests for treatment were ignored.

171.    Eventually, the nurse on duty contacted Dr. Capparelli, who instructed the nurse to have Ms. Blevins' family bring her anti-convulsant medication to the SCJ and then administer the medication to Ms. Blevins.  But, Ms. Blevins alleges, Dr. Capparelli did not direct the nurse – or anyone else – to call an ambulance or to take her to the hospital. Ultimately, no anti-convulsant medication was obtained from Ms. Blevins' family. Hours later, someone decided to take Ms. Blevins to the hospital. She was eventually transported to the hospital by an off-duty police officer.

172.    Ms. Blevins alleges that when she returned to the SCJ, nurses and staff again refused to provide her with anti-convulsant medications, and she continued to experience seizures, until she was ultimately released from custody. Like Ms. Brawner, Ms. Blevins' lawsuit alleges that she suffered severe and permanent brain injuries.

## VI.  WAIVER OF IMMUNITY

173.    Scott County has waived immunity for negligence of the county and county employees, misconduct of deputies acting under color of law, and for the negligence of deputies or employees of the SCSO or the county, as set out in Tenn. Code Ann. §29-20-305, and for intentional acts or misconduct done by deputies under color of law, as set out in Tenn. Code Ann. §8-8-302-302. There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

-48-

## VII.  CLAIMS FOR RELIEF

## COUNT ONE

## VIOLATION OF CIVIL RIGHTS LAWS UNDER COLOR OF LAW
## 42 U.S.C. § § 1983 and 1988

### Failure to Provide Adequate Medical Care

### (Against Individual Defendants)

174.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim herein.

175.    Under 42 U.S.C. § 1983, a person has a federal cause of action for money damages against an individual acting under color of state law who deprives another of rights, privileges, or immunities secured by the United States Constitution and federal laws. Here, each of the Individual Defendants were acting under color of state law.

176.    The Fourteenth Amendment to the United States Constitution requires that pretrial detainees be provided adequate medical care while in the custody of any governmental entity.

177.    An individual officer engages in conduct in violation of the Due Process Clause of the Fourteenth Amendment where he or she demonstrates deliberate indifference to the serious needs of a pre-trial detainee, such as Mr. Pemberton, by intentionally denying or delaying adequate medical care for said person. Here, a reasonable layperson would have concluded that Mr. Pemberton needed medical treatment even during his first few days of confinement.

178.    Upon information and belief, each of the Individual Defendants encountered Mr. Pemberton during his incarceration and knew that he had a serious medical condition and that it was getting progressively worse. After all, within two days of his arrival at the SCJ, Mr. Pemberton began complaining about a deep cut and pain in his left foot. As the undetected staph infection

-49-

spread, Mr. Pemberton's health rapidly declined, punctuated by increasing pain in his left leg, an unusually and consistently high fever, the inability to walk or get out of bed, loss of appetite, and ultimately, the loss of bodily functions. By the second week of his confinement, he began to suffer multiple-organ shutdown.

179.    All of the Corrections Officer Defendants and Nurse Massengale, at varying times and instances, witnessed Mr. Pemberton in E-Pod, the booking cell,[32] or the holding cell suffering from the serious medical symptoms described herein – from being unable to walk, unable to stand, unable to go to the bathroom unassisted, unable to wash himself, vomiting, and losing his appetite, to begging for help over being in constant headaches and pain, and then losing control of his bodily functions and being unconscious. Thus, the Correction Officer Defendants and Nurse Massengale had actual knowledge that Mr. Pemberton was suffering from an emergent medical condition for which he needed immediate and competent treatment and care.

180.    Yet, all of the Corrections Officer Defendants and Nurse Massengale disregarded the risks posed by Mr. Pemberton's emergent medical condition and failed to provide the necessary medical care to stop the staph infection from spreading.

181.    At various times during his incarceration, several of the Defendant Corrections Officers and Nurse Massengale laughed at Mr. Pemberton or made fun of him as he begged for help, responding that he was nothing but a "junkie" and that nothing was wrong with him, as he was "just detoxing." These remarks were made notwithstanding Mr. Pemberton displaying multiple symptoms of a very serious medical condition.

---

[32]The booking area typically housed inmates that were either intoxicated, needed medical attention, or had inmates who required protection.

182.    Hearing and observing the Individual Defendants disregard Mr. Pemberton's pleas for help, other inmates repeatedly complained on his behalf.  Each of the Corrections Officer Defendants, Nurse Massengale, and indirectly, Dr. Capparelli were exposed to Mr. Pemberton during his two-week long incarceration, hearing, seeing, and observing him during that time, or otherwise receiving information about his condition. It is implausible to believe that any of them were unaware of Mr. Pemberton's rapidly devolving medical condition.

183.    Upon information and belief, all of the Correction Officer Defendants, Nurse Massengale, and Dr. Capparelli had actual knowledge that Mr. Pemberton was exhibiting physical signs and symptoms of a serious illness well before he was taken to the hospital. All of them also had actual knowledge – as early as Friday, July 15, 2016 – that Mr. Pemberton's medical condition had so rapidly deteriorated that he began to lose control of his bodily functions, urinating and defecating on himself. Still, they failed to provide him with medical care.

184.    MRSA responds to certain antibiotics, and in some cases, antibiotics may not even be necessary.  According to The Mayo Clinic, doctors may instead drain a superficial abscess caused by MRSA. [http://www.mayoclinic.org/diseases-conditions/mrsa/basics/treatment/con-20024479]. If these Defendants would have responded to Mr. Pemberton's symptoms and pleas for help, his staph infection could have been treated, either with effective antibiotics or a surgical procedure, and it is likely that the infection would have been stopped before spreading to the rest of his body.

185.    A layperson would have noticed – and several inmates did – that Mr. Pemberton was very sick.  It did not take someone with a medical background to recognize that Mr. Pemberton was seriously ill. Any reasonable lay person witnessing Mr. Pemberton's worsening symptoms over the

-51-

14-day period of his incarceration would have recognized that he was in serious medical distress and would have sought medical treatment and care for him.

### Corrections Officers

186.    Corrections Officer David Dysarczyk worked at the SCJ for about eight months, including July 2016. Officer Dysarczyk told FBI agents that every officer was aware of Mr. Pemberton's medical issues and knew that he had health issues "beyond detoxing." Certainly, as Plaintiff has described in detail, each of the Corrections Officer Defendants had actual knowledge that Mr. Pemberton had a serious medical need and did nothing to insure that he received medical treatment care for his devolving condition.

### Dr. Edward W. Capparelli and Nurse Brittany Massengale

187.    According to the SCJ administrator, Cpt. Tucker, if an inmate needed medical care, there were kiosk machines in general population cells for inmates to fill-out a medical request form. Of course, Mr. Pemberton was not housed in a general population cell for much of his incarceration. Inmates could also let an officer know that they have medical needs and the nurse would be notified. This too, proved futile for Mr. Pemberton, as he and other inmates sought medical help, to no avail.

188.    Lt. Stephens reported in an FBI interview that if Mr. Pemberton was housed in general population and subsequently became ill, SCJ procedures would have called for him to have been moved to the booking area so that staff could keep a better eye on him. Of course, Mr. Pemberton was instead moved to Holding Cell #1 (as far away as possible) in order to isolate him – not observe him – and to keep him from causing a disturbance.

189.    Lt. Stephens said that if Corrections Officers decide that a prisoner may be having medical problems, procedures dictate they call the nurse, the doctor on call, or EMS. Corrections

-52-

Officers are responsible for checking on inmates, and if they identify problems, they provide information to Lt. Stephens. SCJ employs a full time nurse that works during the day shift. A doctor is always on call. If a medical incident happens during the day, jailors are to first call the nurse. If a medical incident happens at night, jailors can first call the nurse at home, or can call the on call doctor, or EMS, at their discretion. But Mr. Pemberton was having a medical problem by the second day of his 14-day incarceration and his symptoms got progressively – *and visibly* – worse. Yet, he saw a nurse only once and was never seen by a doctor.[33]

190.   According to Dr. Mileusnic, a medical professional should have noticed the progression of symptoms.

191.   *Dr. Capparelli.* Scott County and ACH entered into an agreement for the provision of inmate health services. Paragraph 1.1.1 of that agreement provided that:

> 1.1.1   SITE PHYSICIAN.  Physician/Nurse Practitioner shall visit the facility once each week or as otherwise agreed to by the SHERIFF and ACH. Physician/Nurse Practitioner shall serve as the facility's Site Physician and be available by telephone to facility and medical staff on an on-call basis, seven (7) days per week, twenty-four (24) hours per day.

192.   This was a minimum service requirement. Because Nurse Massengale was the "facility nurse," the agreement appears to indicate that a physician would visit the SCJ "once a week" and "be available by telephone . . . seven (7) days per week, twenty-four (24 hours per day." Dr. Capparelli was the "site physician."

193.   By agreement, Dr. Capparelli was scheduled to visit inmates at the SCJ one day out of the week. Corrections Officers have indicated in statements to the FBI that Dr. Capparelli did not

---

[33]Officer Dysarczyk said that he did not believe Mr. Pemberton was ever seen by a doctor while he was incarcerated. The SCJ's medical care is "mediocre," Officer Dysarczyk reported, especially Nurse Massengale.

come to the SCJ during the entire period of Mr. Pemberton's incarceration. According to Sgt. Brown, Dr. Capparelli was only available approximately 50% of the time.

194.     Dr. Capparelli's role in the circumstances surrounding Mr. Pemberton's death went well beyond his directions to Sgt. Brown on July 20, 2016 to transport Mr. Pemberton to the hospital a few hours before he died. For instance, Dr. Capparelli knew – *i.e.*, by virtue of multiple reports to him about Mr. Pemberton – about Mr. Pemberton's medical condition. He knew, for instance, that Mr. Pemberton had an infection from "a boil" on his chest and had approved a 5-day regimen of the anti-bacterial drug, Bactrim.[34] Other than untrustworthy log-entries indicating Bactrim was dispensed on July 12-16, 2016 for the "boil," there is no record that Nurse Massengale or Dr. Capparelli followed up their treatment with an examination of Mr. Pemberton. He also knew by July 16, 2016, just days before Mr. Pemberton's death, by virtue of a phone call from Sgt. Mason, that Mr. Pemberton was "'b]reaking out in sweats, can't walk good, throwing up, feeling dizzy."[35]

195.     *Nurse Massengale.* The SCJ administrator, Cpt. Tucker, told FBI agents that Nurse Massengale frequently called in sick for work. When she was absent, ACH was supposed to have provided a substitute nurse. Her leave was approved through ACH, not the SCJ. Corrections Officers also indicated through statements to the FBI that Nurse Massengale was frequently absent from the SCJ. Inmate Mills told FBI agents that Nurse Massengale was hardly ever at the SCJ and that it

---

[34]The autopsy report on Mr. Pemberton indicates that the staph infection that ultimately killed Mr. Pemberton was unrelated to the "boil" on his chest, and stemmed from another source.

[35]Notably, Dr. Capparelli was also involved in another case where it was alleged he failed to provide adequate medical care to an inmate, *Blevins v. Scott County, et al.*, No.3:17-cv-00348-TRM-CCS (E.D. Tenn. Aug. 10, 2017). That lawsuit, now settled, claimed that Dr. Capparelli ignored the plaintiff's seizures and caused plaintiff to suffer "severe and permanent brain injuries."

-54-

would take "a few days to weeks" before an inmate could get an appointment to see her. Inmates had to make appointments to see her using the kiosk machine.[36]

196.    According to Officer Washam, the Air Force veteran, Nurse Massengale was "terrible." She treated inmates horribly and was very vindictive. In his view, medical conditions at the SCJ were substandard, at best.

197.    Inmate Lay stated in an interview with FBI agents that he heard Mr. Pemberton tell the nurse (Nurse Massengale) that he was hurting and in pain and that he thought it might be a blood clot because he was hurting in different places on his body. She said, "if the clot doesn't go to your brain then you'll be ok."

198.    Nurse Massengale purportedly is supposed to perform a physical examination on all new inmates. Mr. Pemberton never received a physical examination at the SCJ.

199.    According to Dr. Mileusnic, a nurse would definitely notice significant changes in symptoms or be concerned about them, as some symptoms and signs were present in advance prior to his hospitalization or the final terminal event.

200.    Insofar as what should have been done, Dr. Mileusnic put it this way:

> Usually when there's an infection it needs to be treated with the antibacteria agent or antibiotic. What we classically learn through our education is that one would take a sample, send it to the lab and start treating it. And if the lab results come back positive for something and susceptibility is done and then you realize there was a better treatment, then of course you switch to a whatever better treatment was. But I don't think that was done. I don't think any sample was sent to the lab.

---

[36]On Nurse Massengale's days off, if the staff had any medical issues, they were supposed to call Dr. Capparelli or 911.

-55-

201.     By not seeing to Mr. Pemberton's serious medical needs, these Defendants allowed his condition to worsen, escalating into a life-threatening condition that proved fatal. If Mr. Pemberton had been taken to the hospital, medical personnel would have properly diagnosed the infection and began to effectively treat it. There is verifying medical evidence that establishes the detrimental effect of the delay in medical treatment.

202..     The failure to provide adequate medical treatment rose to a Constitutional violation. As a proximate result of the conduct of these Defendants, the untreated staph infection resulted in Mr. Pemberton's death.

203.     To illustrate the indifferent mindset of Corrections Officers after Mr. Pemberton's horrible death, Officers Dysarczyk and Mason reported to FBI agents that Mr. Pemberton's death "was not a big deal" among Corrections Officers at the SCJ.

204.     Based on the foregoing, these Defendants exhibited deliberate indifference to Mr. Pemberton's serious medical needs, which directly caused his death, and are liable to Plaintiff pursuant to the provisions of 42 U.S.C § 1983.

205.     Plaintiff seeks any and all damages allowable under state or federal law, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

-56-

## COUNT TWO

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
### 42 U.S.C. §§ 1983 and 1988

### Failure to Train and Supervise/Acquiescing-In and
### Ratifying Unconstitutional Conduct of Subordinates

### (Against Sheriff Philips, Chief Deputy Silcox, and Chief Detective Lewallen)

206.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim herein.

207.    Sheriff Phillips and Chief Deputy Silcox had a duty to train and supervise their Corrections Officers to insure the provision of adequate medical care to inmates with serious medical needs. They failed to train and supervise their Corrections Officers properly; failed to investigate allegations that inadequate medical care resulted in Mr. Pemberton's death; and along with Detective Lewallen, covered up Corrections Officers' deprivation of medical care by refusing to conduct an investigation of the circumstances surrounding Mr. Pemberton's death and implicitly authorizing, approving, or knowingly acquiescing in the unconstitutional conduct alleged herein by deciding not to investigate the circumstances surrounding Mr. Pemberton's death and not reprimanding anyone for their actions or inaction.

208.    Sheriff Phillips and Chief Deputy Silcox had an opportunity to implement corrective action against the Corrections Officers involved, but did not.

209.    None of the Corrections Officers whose actions resulted in Mr. Pemberton's death received disciplinary action of any kind.

210.    It is unlikely that the circumstances of an inmate's death, as Plaintiff has described, would have been unknown to Sheriff Phillips and Chief Deputy Silcox. Still, there was no

-57-

investigation into Mr. Pemberton's death.  Sheriff Phillips, involved in enforcing all of the SCSO's policies, "rubber stamped" the misconduct of his Corrections Officers.

211.     Ratification of the heinous conduct surrounding Mr. Pemberton's death, as described herein, by Sheriff Phillips and Chief Deputy Silcox sent a message to Corrections Officers that they are allowed to do whatever they want, whenever they want, to whomever they want, irrespective of inmates' Constitutional rights.

212.     The conduct of Sheriff Phillips, Chief Deputy Silcox, and Detective Lewallen was intentional, malicious, willful, wanton, and in reckless disregard of Mr. Pemberton's constitutional rights and/or grossly negligent, shocking the conscience, so as to justify punitive damages.

213.     Plaintiff seeks any and all damages allowable under state or federal law, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT THREE

## VIOLATION OF FEDERAL CIVIL RIGHTS
## 42 U.S.C. §§ 1983 and 1988

### Failure to Protect

### (Against All Individual Defendants)

214.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim herein.

215.     The Individual Defendants, each of whom had actual knowledge of the deprivation of medical treatment and care of inmates at the SCJ and use of the "hole" as a punitive sanction, and of Mr. Pemberton's serious medical needs throughout his incarceration, did nothing to render him aid or stop the cruel and unusual punishment, are liable for failing to protect Mr. Pemberton from harm.

-58-

216. From the moment of Mr. Pemberton's incarceration, the Individual Defendants owed him a duty of care to protect him from harm. A special relationship existed between Mr. Pemberton and the Individual Defendants which gave rise to that duty and they breached their duty by withholding medical care from him, and by allowing him to be put in "the hole" where his pleas for help were less disruptive.

217. As a direct and proximate result of the acts or omissions of the Individual Defendants, Mr. Pemberton suffered needlessly throughout his confinement, before his ultimate death.

218. Plaintiff seeks any and all damages allowable under state or federal law, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT FOUR

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
## 42 U.S.C. §§ 1983 and 1988

## (MONELL CLAIM)
## Policy, Custom, Failure to Provide Adequate Medical Care

## (Against Scott County)

219. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim herein.

220. The United States Constitution requires that inmates be provided adequate medical care while in the custody of any governmental entity.

221. A governmental entity may be held liable based upon its officers' deliberate indifference to and violation of any citizen's constitutional rights where a custom, policy, or procedure of the municipality is found to be the proximate cause of the constitutional violation.

-59-

222.    Here, Scott County failed inspections by the Tennessee Corrections Institute ("TCI")

in 2015, 2016, and 2017 for, among other things, repeatedly:

■ failing to consistently complete intake screenings to check for serious illnesses or wounds and to check for prescribed medication;

■ failing to consistently inform inmates of sick call or how to make grievances about medical care;

■ failing to make security checks regularly, in contravention of policy and procedures or medical protocol; and

■ failing to properly document records demonstrating that inmates had actually received medical care, and not performing inmate physicals within 14 days of intake, as required.

223.    Most notably, the SCJ had been decertified immediately prior to Mr. Pemberton's

incarceration on July 6, 2016 (on May 26, 2016) for failing to provide adequate medical care (*e.g.*,

not performing medical screenings and not informing inmates about available medical care).

224.    In addition to failing inspections, Scott County also has a history of failing to provide

adequate medical care to specific inmates. Indeed, Mr. Pemberton's is one of *three cases in a six-*

*month period* – all described above in detail – in which SCJ Corrections Officers, Nurse Massengale,

and/or Dr. Capparelli are alleged to have caused or contributed to serious injuries or death of

inmates.

225.    Tammy Brawner alleged that she was a former inmate in the SCJ and was deprived

of required medicine to prevent seizures and was also tased after being accused of "faking" the

seizures. *Brawner, et al. v. Scott County, et al.*, No. 3:17-cv-00108-JRG-HBG, Doc. 8, at Page ID#:

89-118 (E.D. Tenn. March 31, 2017). She alleges that the untreated seizures left her with permanent

brain damage. Ms. Brawner's mistreatment at the SCJ overlapped the time-period in which Mr.

Pemberton was mistreated and eventually died (July 2016).

-60-

226. As in this case, Ms. Brawner sued Scott County, SCJ Corrections Officers, and medical professionals working at the SCJ. There, as here, the Corrections Officers and medical professionals did nothing to aid Ms. Brawner's serious medical condition, failing to provide her with required medication even after she began having seizures. According to Ms. Brawner, Corrections Officers also accused her of "faking" seizures, and even tried to taze her out of "faking it."[37]

227. Second, Jesse Perry, whose incarceration also overlapped Mr. Pemberton's, alleged that he contracted TB during his time at the facility and claims that he and other inmates were exposed to the disease while incarcerated. *Perry v. Scott County, et al.*, No. 3:17-cv-00234-TAV-HBG, Doc. 1, at Page ID#: 1-10 (E.D. Tenn. June 1, 2017). Perry alleged that the SCJ's health-screening protocols jeopardized his health, corrections officers ignored serious medical conditions, and the Sheriff allowed inmates to be booked without proper health-screening to save costs.[38]

228. Third, yet another former inmate sued Scott County and ACH for civil rights violations for inadequate medical care. *See Blevins v. Scott County, Tennessee et al.*, No.5 3:17-cv-00348-TRM-CCS (E.D. Tenn. Aug. 10, 2017). That lawsuit claims Dr. Capparelli ignored the plaintiff's seizures and caused the plaintiff to suffer "severe and permanent brain injuries."[39]

---

[37]The docket in the *Brawner* case indicates that Brawner settled her claims against ACH and individual Scott County corrections officers, but that the *Monell* claim against Scott County was ultimately dismissed due to Brawner's failure to put on sufficient proof.

[38]The docket in the *Perry* case indicates that summary judgment motions are fully briefed, a trial is scheduled for January 28, 2020, and Perry has moved to continue the trial date.

[39]The docket in the *Blevins* case indicates that the parties settled Blevins's claims after District Judge McDonough denied the defendants' motion(s) to dismiss.

-61-

229.    This recent history of providing inadequate medical care to inmates is indicative of a custom, policy, or practice of deliberate indifference at SCJ. But for this unconstitutional custom, policy, or practice, the Corrections Officer Defendants would not have exhibited deliberate indifference to Mr. Pemberton's serious need for medical attention throughout his incarceration, but would have instead provided him the necessary antibiotics, immediately sent him to the hospital, or otherwise afforded him adequate medical treatment and care once he began experiencing the tell-tale signs of a serious infection.

230.    In this case, the policy and procedures of Scott County, as described herein, were substantial factors in Mr. Pemberton's death.

231.    For all of these reasons, Scott County has abdicated its governmental responsibilities to provide a safe and secure incarceration environment to suspects suffering severe mental disorders.

232.    Plaintiff seeks any and all damages allowable under state or federal law; attorney's fees pursuant to 42 U.S.C. § 1988; costs of this action; and discretionary costs.

**COUNT FIVE**

**VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW**
**42 U.S.C. §§ 1983 and 1988**

**(MONELL CLAIM)**
**Failure to Train and Supervise and**
**Ratification of Unconstitutional Conduct**

**(Against Scott County)**

233.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim herein.

-62-

*Defacto Policy, Practice, or Custom*

234.    Scott County had a duty of care to Mr. Pemberton to ensure that its officers and agents were properly trained in the appropriate procedure for the provision of adequate medical care. This duty extends to ensuring that officers were properly trained concerning the limits of their authority to withhold medical care, particularly as to inmates presenting a serious medical need. The duty further extends to ensure that supervisory officers are properly trained not to overlook or condone unnecessary and unreasonable deprivations of adequate medical care. These duties were all breached, as described herein.

235.    Scott County, through its policies and procedures, has failed to adequately train and supervise its officers (including medical personnel) to provide inmates adequate medical care for serious medical needs. For example, but for Scott County's improper policies and procedures:

■ Mr. Pemberton's serious medical condition would not have gone untreated and allowed to worsen throughout his incarceration, resulting in a painful and undignified death;

■ someone in the SCJ would have provided him adequate medical care instead of laughing at him, assuming he was simply "detoxing," and disregarding the severity of his condition; and

■ Mr. Pemberton's actual medical condition would have been accurately explained to EMTs and hospital medical personnel.

236.    By ratifying the mistreatment of Mr. Pemberton by failing to investigate and/or reprimand anyone involved in the circumstances surrounding his death, Sheriff Phillips, Chief Deputy Silcox, and Chief Detective Lewallen acquiesced in the unconstitutional conduct of their subordinates through the execution of their job functions. These actions constitute ratification and render Scott County liable to Plaintiff.

-63-

237.    Upon information and belief, Scott County has failed to develop a lawful policy to provide adequate medical care to inmates and has failed to train its officers in the proper manner in which to provide adequate medical care. If a policy exists at all, it is so ineffectual as to constitute no policy at all. Scott County's failure to develop and promulgate lawful policies outlining the guidelines for the appropriate provision of adequate medical care and to properly train officers to follow such guidelines constitute deliberate indifference to the Constitutional rights of citizens.

238.    The actions of the Corrections Officer Defendants and Nurse Massengale evidence a complete lack of training in the proper methods related to recognizing serious medical problems and providing adequate medical care. The failure of supervisors to recognize or appreciate the gravity of those officers' actions implies that they, too, found no wrong in the conduct, and green-lit the continuation of violating the civil rights of inmates in this manner.

239.    Official policy usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.

240.    The acts and omissions of the aforementioned officers and supervisors demonstrate that, prior to July 6, 2016, Scott County had developed and maintained a defacto policy, custom, or practice of exhibiting deliberate indifference to whether adequate medical care was provided to inmates in serious medical need, which ultimately resulted in the violations of Mr. Pemberton's civil rights and his death.

241.    Here, the Corrections Officer Defendants correctly believed their actions would not be properly monitored or corrected by supervisory officers and that their misconduct would be tolerated and accepted by them.

-64-

242. These failures demonstrate a policy, practice, or custom that resulted in Mr. Pemberton's death. Scott County, while having established certain "policies and procedures" regarding the procedure for the provision of medical care, failed to enforce those policies and/or to appropriately discipline and/or sanction those who disregard those policies and procedures, establishing, by custom and usage, a de facto policy of, among other things, allowing unreasonable deprivations of adequate medical care to go unchecked.

243. Such acts and omissions constitute a violation of §1983 and deprived Mr. Pemberton of his rights under the Eighth and Fourteenth Amendments. The actions were done with actual malice and willful and wanton indifference toward Mr. Pemberton and with deliberate disregard for his Constitutional and statutory rights, constitute deliberate indifference, and were the direct and proximate cause of his death.

### *Ratification of Unconstitutional Conduct*

244. Chief Detective Lewallen informed Mr. Pemberton's mother that there would be no investigation of the circumstances surrounding her son's death. He based his decision, authorized by Sheriff Phillips and Chief Deputy Silcox, on the false and unreasonable assumption that Mr. Pemberton's death resulted from past drug use. As he made that statement, Chief I've Lewallen was pointing to Dr. Mileusnic's autopsy report that clearly showed that Mr. Pemberton's death had *nothing to do with past drug use*, but was caused by an *untreated staph infection* that began in a cut on his left foot. While Mr. Pemberton had been an IV drug user in the past, the report showed that none of the old needle marks on Mr. Pemberton's body had contained abscesses or bacteria linked to the untreated staph infection that killed him.

-65-

245. The SCSO's failure to investigate the circumstances surrounding Mr. Pemberton's death was incredible:

■ Not one of the Corrections Officers who knew that Mr. Pemberton was unable to walk, stand, go to the bathroom, or eat and was in considerable pain, and who were, at various times, in a position to render him aid, were investigated by the SCSO.

■ Not one of the Corrections Officers who lied on their reports about Mr. Pemberton's condition were investigated by the SCSO.

■ Not one of the Corrections Officers who failed to call 911 for Mr. Pemberton when he was initially found unconscious, first on July 18, 2016, then on July 20, 2016, was investigated by the SCSO.

■ Not one of the Corrections Officers who gave false and misleading information to EMTs and medical professionals and/or who withheld vital information from EMTs and medical professionals about Mr. Pemberton's actual condition during his incarceration was investigated by the SCSO.

■ Not even Sgt. Brown – who sent EMTs away the night before after they informed her Mr. Pemberton needed immediate hospital care; ordered trusties to clean Mr. Pemberton up after he was found on the cell floor unconscious before she would call 911; made at least four telephone calls before she ordered an ambulance; and wanted to transport Mr. Pemberton *by patrol car* and not an ambulance – was investigated by the SCSO.

246. By ratifying all of this behavior, Scott County, Sheriff Phillips, Chief Deputy Silcox, and Chief Detective Lewallen knowingly acquiesced in and ratified the unconstitutional conduct of their subordinates through the execution of their job functions. Their failure to investigate the circumstances surrounding Mr. Pemberton's death, to discipline officer misconduct, or take other corrective action implicitly ratified unconstitutional actions.

247. Plaintiff seeks any and all damages allowable under state or federal law; attorney's fees pursuant to 42 U.S.C. § 1988; costs of this action; and discretionary costs.

-66-

## COUNT SIX

## VIOLATION OF FEDERAL CIVIL RIGHTS
### 42 U.S.C. §§ 1983 and 1988

### (MONELL CLAIM)
### Use of Cruel and Unusual Punishment

### (Against Scott County)

248.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim herein.

249.    At all times material hereto, Scott County and Sheriff Phillips authorized the use of "the hole" at the SCJ.

250.    The use of "the hole" – a holding cell near the sally port – to segregate Mr. Pemberton from others because he was making too much noise by crying in pain, begging for help, and trying to get the attention of Correction Officers, constituted cruel and unusual punishment, which violated Mr. Pemberton's rights under the Eighth and Fourteenth Amendments.[40]

251.    Scott County owed a duty of care to Mr. Pemberton to ensure that its employees were properly trained in the use of punishment, particularly as to seriously-ill inmates; the limits of the authority to impose punishment on inmates, particularly as to seriously-ill inmates; and that supervisory officers not condone the imposition of cruel and unusual punishment, particularly as to seriously-ill inmates.  Specifically, Scott County owed a duty of care to properly train those officers and personnel working at the SCJ concerning the appropriate use of "the hole."

---

[40]According to Dr. Mileusnic, who performed the autopsy on Mr. Pemberton's body, after Mr. Pemberton experienced terminal seizures, he would have been unable to talk or walk. He would also have been making a lot of noise due to the pain he was experiencing and would also have had a painful headache.

-67-

252.    The use of isolation cells frequently serves a legitimate penalogical purpose, but using such cells to punish sick and seriously-ill inmates or to do so merely to remove them from the general population because their illness causes them to be disruptive, without affording medical treatment, is cruel and unusual punishment. Here, Mr. Pemberton was put in "the hole" on at least two separate occasions during his two-week long incarceration for reasons not legitimate to the purpose of solitary confinement.

253.    On neither occasion was Mr. Pemberton provided adequate medical treatment. Instead, he was placed in "the hole" because his cries for help were deemed "disruptive" by Sgt. Brown and other Corrections Officers. Sheriff Phillips, who oversees the SCJ and whose office is in the same building, has known that "the hole" is used as punishment for seriously-ill inmates or to isolate them in a less disruptive location, yet, he failed to take action to prevent the abuses.

254.    Scott County's failure to develop and promulgate policies outlining the guidelines for appropriate use of "the hole" constitutes deliberate indifference to inmates' constitutional rights.

255.    Scott County has established, by custom and usage, a de facto policy of permitting "the hole" to be used as a punishment against sick or seriously-ill inmates, in violation of Mr. Pemberton's constitutional rights to be free from cruel and unusual punishment.

256.    Scott County had actual or constructive knowledge that "the hole" was being used in a manner that was coercive and in violation of the rights of inmates to be free from cruel and unusual punishment, yet acquiesced in its continued misuse.

257.    Plaintiff seeks any and all damages allowable under state or federal law; attorney's fees pursuant to 42 U.S.C. § 1988; costs of this action; and discretionary costs.

-68-

**COUNT SEVEN**

**VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW**

**42 U.S.C. §§ 1983 and 1988**

**(MONELL CLAIM)**
**Custom, Policy, Pattern, or Practice of Deliberate Indifference**
**in Failing to Provide Adequate Medical Care to Inmates**

**(Against Advanced Correctional Healthcare and Scott County)**

258.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

259.     For purposes of 42 U.S.C. § 1983, both Scott County and ACH acted under color of state law in providing (or failing to privide) medical care to inmates, like Mr. Pemberton.

260.     ACH is a for-profit privately owned jail healthcare company and the contracted medical provider for inmates in the SCJ at all times relevant hereto. To maximize profit, ACH minimizes expense by staffing jails, like SCJ, with an LPN (here, Nurse Massengale) and/or an RN, supervised by physicians or APRNs who rarely visit the jails more than once a week and who instead prefer to diagnose and treat obviously serious (if not life-threatening) medical conditions based upon brief telephonic reports after cursory medical examinations (typically, merely taking the inmate's subjective complaints and vital signs).

261.     Scott County and ACH, as well as Dr. Capparelli, have also established deliberately-indifferent policies, customs, practices, or patterns concerning inmate medical care, including, but not limited to a policy, custom, practice, or pattern of delaying or even denying necessary medical treatment to avoid liability for inmate medical bills.

-69-

262.     To effectuate this policy, custom, practice, or pattern, Scott County and ACH entered into an agreement or plan to delay or deny necessary medical care to inmates in order to avoid having to pay outside providers for medical care for inmates (*e.g.*, ambulance, EMTs, clinics, outside physicians, hospitals). Scott County and ACH were on notice that this policy, custom, practice, or pattern created a substantial risk of serious harm to the health of inmates, causing them to experience unnecessary pain and suffering. They had such knowledge via inmate complaints, communications from correctional officers, from their own observations, from common sense, from other deaths, from other lawsuits, and in other ways.

263.     With deliberate indifference to the serious medical needs of inmates, Scott County, ACH and Dr. Capparelli failed to develop and implement adequate policies and procedures for handling inmates with serious health conditions at the SCJ, with the foreseeable result that inmates like Mr. Pemberton would not receive appropriate treatment. Indeed, ACH has a history of providing inadequate medical care to inmates in the SCJ and elsewhere, which has often resulted in serious injuries, or, as here, inmate deaths.

### A.      ACH and Scott County Prioritize "Cost-Control" over Inmate Health and Safety.

264.     It was well known to Corrections Officers that ACH had a practice of delaying or even denying referrals of inmates for outside medical care. Corrections Officers were also aware that ACH was making medical care decisions regarding inmates that prioritized "cost-control" over inmate health and safety. Pursuant to longstanding practice, jail medical care is solely within the discretion of ACH personnel.

-70-

265. Plaintiff's investigation uncovered information to suggest that Sheriff Phillips made it clear to his Corrections Officers that inmate healthcare costs were a problem at the SCJ and that they needed to cooperate with ACH's staff in order to control those costs.

266. Pursuant to longstanding practice, all grievances regarding SCJ medical care are turned over to ACH and not reviewed by Sheriff Philips or the SCSO. However, Plaintiff's investigation suggests that ACH's custom or policy is to conceal the right of inmates to make a grievance about medical care or to simply ignore all inmate grievances. Indeed, TCI reports have specifically referred to the failure of SCJ to inform inmates of their right to submit a grievance from 2015-2017, which includes the period during which Mr. Pemberton was incarcerated.

267. Scott County, Sheriff Phillips, Dr. Capperelli, and ACH have each failed and refused to evaluate the quality of inmate medical care and address the obvious systemic problems that led to Mr. Pemberton's death, brain damage to at least two other inmates, and another inmate's contraction of TB over the course of just a few months (February 2016-July 2016).

268. The deferral by Corrections Officers to ACH of all decisions to delay and deny necessary medical care for "cost-control" reasons is also a matter of contract.

269. As in other jurisdictions, upon information and belief, ACH was awarded the SCJ contract by touting its alleged ability to control expenses incurred for outside medical care.

270. Upon information and belief, ACH and Scott County negotiated a "cap" on outside medical care costs. If costs exceed that cap, Scott County would be responsible. If ACH beats the cap, ACH gets to keep the difference between actual outside costs and the cap as profit.

271. Pursuant to this agreement, Corrections Officers are trained to defer to ACH personnel regarding medical matters – regardless of the severity of an inmate's condition.

-71-

Corrections Officers are also trained not to contact emergency personnel, even if there is indeed a medical emergency. They are trained to contact the ACH nurse.

272.    Upon information and belief, the agreement also requires ACH to provide substantial insurance coverage, to name the county and the Sheriff as additional insureds, and to indemnify the Sheriff, the county, and their agents and employees in connection with any claim related to healthcare services. Under the contract, as long as Corrections Officers defer to ACH medical personnel on medical decisions, they are indemnified by ACH's insurance carrier. In other words, even the contract encourages Corrections Officers to defer to ACH personnel.

273.    Corrections Officers have claimed, or are expected to claim, that they cannot be responsible for deficient medical care by ACH personnel. Sheriff Phillips and the officers he supervises, however, were well aware – based upon previous incidents – that ACH provided substandard and frequently inhumane medical care to inmates.

274.    In whole or in part because of the agreement, particularly its indemnification provision, Sheriff Phillips has failed and refused to address the known systemic deficiencies regarding medical care at the SCJ.

275.    Under the agreement, for Scott County to avoid liability for excess medical care costs, it was necessary for Sheriff Phillips and the Corrections Officers he manages to cooperate with ACH in controlling outside medical costs.

276.    ACH's business model, as reflected in the agreement, succeeds by underbidding the competition and implementing severe cost-control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt with through liability insurance).

-72-

277.    Scott County and Sheriff Phillips were well aware of ACH's business model, were aware ACH prioritized "cost-control" over inmate health and safety, yet they retained ACH as the contractor because it saved money. Thus, Scott County also contributed to the above-described customs, patterns, or policies by not providing adequate funds for inmate medical care.

278.    The primary areas in which ACH implemented cost-control measures were staffing, medications, and referrals to outside providers.

279.    In order to control costs, ACH – with the knowledge and consent of Sheriff Phillips and Scott County – staffed the SCJ inadequately, hired sub-standard medical personnel willing to put costs over inmate health and safety, denied inmates medications, and delayed or denied medically necessary referrals to outside providers, including necessary medical treatment like that denied Mr. Pemberton and countless others.

280.    Tennessee law vests final policymaking authority for inmate-medical care in Sheriff Phillips. However, via the agreement with ACH and longstanding practice, Sheriff Phillips has delegated final policymaking authority regarding inmate medical care to ACH, making Scott County also liable for ACH's decisions.

281.    While the agreement gives Sheriff Phillips and Scott County the authority to hold ACH accountable regarding the costs of inmate medical care, it provides no mechanism at all for reporting and accountability regarding the quality of inmate medical care, and neither Sheriff Phillips nor Scott County have made an effort to hold ACH accountable for how it handles such care.

282.    In summary, the deliberately-indifferent customs, policies, and practices of ACH and Scott County in place at the SCJ include, but are not limited to, the following:

-73-

- Not investigating serious known incidents of deliberate indifference by ACH and correctional personnel;

- Not evaluating or responding to inmate-grievances regarding medical care;

- Placing inmates with serious medical conditions in isolation cells when they obviously need, at a minimum, further testing and/or evaluation at a hospital;

- Training Corrections Officers to defer to ACH medical decisions even when it is obvious the inmate's condition requires hospitalization;

- Allowing the medical condition of inmates to deteriorate without taking the inmate for evaluation and/or treatment at a hospital;

- Training Corrections Officers to defer to ACH decisions to allow the medical condition of inmates to deteriorate without taking the inmate for evaluation and/or treatment at a hospital;

- Relying on untrained Corrections Officers to monitor seriously-ill inmates;

- Not training Corrections Officers regarding what obvious symptoms to look for and document while monitoring seriously-ill inmates;

- Not monitoring the vital signs of seriously-ill inmates;

- Not requiring Corrections Officers to document their observations of inmates being monitored for medical risks;

- Not treating an inmate's deteriorating medical condition to the point they are no longer ambulatory as a condition requiring evaluation and treatment in a hospital;

- Not investigating significant deteriorations of inmate-health that indicate potentially life-threatening conditions; and

- Denying inmates experiencing serious pain appropriate pain medication.

-74-

283.    Such practices constitute an arbitrary use of government power, and demonstrate a total, intentional, deliberate, reckless, and unreasonable disregard and indifference to the value of the lives and constitutional and common law rights of inmates at the SCJ, including Mr. Pemberton, and the systematic and deliberate violations of those rights that are likely to result from the regular and systematic pursuit of such practices.

**B.    ACH's History of Providing Inadequate Medical Care to Inmates**

284.    Like Scott County, ACH also has a history of failing to provide adequate medical care to inmates in the SCJ, in other Tennessee county jails, and in numerous jails in other states.

285.    An examination of this and other cases in which ACH has been sued for inadequate medical care indicates that subjective complaints by inmates are routinely disregarded as not credible given the patient's incarceration, criminal charges, and/or substance abuse history. This was certainly the case with ACH's treatment of Mr. Pemberton. Nor is a differential diagnosis or continuity of care provided by ACH employees.

286.    ACH's policy, custom, or pattern of providing inadequate medical care to inmates, particularly inmates with past or existing substance abuse problems, is not limited to the SCJ.  ACH provides medical services to other Tennessee jails. For instance, Christopher Sullivan was booked in the Anderson County jail while suffering from an obvious medical emergency (detoxing). ACH and the Anderson County Sheriff's Office failed to provide proper monitoring of Mr. Sullivan's worsening condition per protocol. His condition deteriorated until he was found dead in his cell. *Hailey v. Anderson County, et al.*, No. 3:15-cv-00280 (E.D. Tenn.). The lawsuit filed in this Court

-75-

by Mr. Sullivan's administrator charges Anderson County and ACH with allowing a custom or practice of deliberate indifference to the serious medical needs of intoxicated persons to exist at the Anderson County jail.[41]

287. ACH also contracts to provide jail medical services to Henderson County, Tennessee. On February 7, 2015, Gina Lenora White died while detained at the Henderson County jail. A lawsuit filed by her administrator charges that from February 5, 2015 until Ms. White's death, ACH and ACH's LPN failed to make any attempt to discover the nature of her medical problems and failed to provide Ms. White with access to appropriate medical care. The lawsuit charges that during the days immediately preceding her death, ACH and Henderson County jail staff were fully aware that Ms. White was physically unable to bathe, eat, drink or care for herself, allowing her to suffer and fester in her own feces, and turning away other inmates who tried to render her aid. Ms. White ultimately died on February 7, 2015 while still covered in her own feces and urine. *White v. Henderson County et al.*, No. 1:16-cv-01020-STA-egb (W.D. Tenn. Feb. 3, 2016).[42]

288. Nor is ACH's brutal brand of jailhouse medicine limited to Tennessee jails. ACH contracts to provide jail medical services with about 250 other SCJs in almost 20 states. The

---

[41]The docket in *Hailey* indicates that Hailey's claims were settled and the case was dismissed by stipulation.

[42]The docket in *White* indicates that White's claims were settled and the case was dismissed by stipulation.

-76-

company's business model has been blamed for so many preventable deaths that it was the subject of an exposé by CBS News.[43] It has also been the focus of similar news articles, including one depicting its business model as a "brutal brand of jailhouse medicine."[44]

289.    ACH also contracts to provide medical services to Bourbon County, Kentucky. In October 2017, ACH was blamed in a civil rights complaint for the death of an inmate as a result of having adopted customs and practices that are systematically applied to inmates who exhibit the symptoms of obviously serious medical conditions. *Bowles et al. v. Kentucky et al.*, No. 5:17-cv-00434-KKC (E.D. Ky. Oct. 31, 2017).[45]

290.    In Christian County, Kentucky, where ACH also contracts to provide jail medical services, Triston Lamark Taylor was incarcerated on September 29, 2016 in the Christian County SCJ. Taylor weighed 350 pounds. About six months later, Taylor was found unconscious in his cell and subsequently died. An autopsy determined that Taylor had died of malnutrition/starvation and weighed 258 pounds at his death, ninety-two pounds less than when he was booked. His administrator alleges that ACH was "unresponsive to the serious medical needs" of Taylor and failed to secure him necessary medical care. *Cartwright v. Christian County, Kentucky et al.*, No. 5:17-cv-00190-TBR (W.D. Ky. Dec. 7, 2017).[46]

---

[43]https://www.cbsnews.com/news/broken-SCJ-healthcare-system-poses-danger-behind-bars).

[44]http://www.mintpressnews.com/advanced-correctionalhealthcares-brutal-brand-of-SCJhouse-medicine/208265).

[45]The docket in *Bowles* indicates that Bowles's claims were settled and the case was dismissed by stipulation.

[46]The docket in *Cartwright* indicates that Cartwright's claims were settled and the case was dismissed by stipulation.

-77-

291.    In Alabama, ACH contracts to provide medical services to the Madison County SCJ. Three suits by pre-trial detainees there target the acts and omissions of both Madison County and ACH. One inmate died of alcohol withdrawal, one of constipation, and third, of gangrene. In all three cases, correctional officers deferred to ACH medical personnel even though it was obvious ACH was doing nothing for the inmate. Corrections officers deferred to ACH personnel because they were trained to do so, although it would have been obvious to a layperson that the inmate needed to be sent to a hospital for evaluation and treatment.

292.    Separate suits alleged that the county and ACH reached an agreement to delay or deny medical care "as a cost-saving measure." With county consent, the suits allege, ACH "staffed the Madison County Jail inadequately, hired substandard medical personnel willing to put cost over inmate health and safety, denied inmates medications and delayed or denied medically necessary referrals to outside providers."

293.    The allegations surrounding the August 2013 death of Deundrez Woods of Huntsville are not only the most disturbing, but also the most similar to the treatment, or lack thereof, provided by ACH and Scott County to Mr. Pemberton in this case. Arrested in June 2013 on shoplifting and assault charges, the 19-year-old Woods behaved normally for several weeks until "jail records show that by August 6, Woods was confused, hallucinating and unable to communicate with correction and medical personnel." He was then moved to the jail's medical unit. *Woods v. Madison County, Alabama et al.*, No. 5:14-cv-01964-KOB (N.D. Ala. Oct. 14, 2014). "They just watched him," his mother's attorney said. "They were happy to let him lie there . . . totally indifferent to what was really going on." On August 17, the odor emanating from his foot was so foul that guards "dragged Woods from his cell to the shower, sprayed him with water and then placed him, still naked, in a

-78-

different cell," the lawsuit states. "Jail records affirmatively show Woods did not eat from August 14-19 and that as of August 12, Woods' water supply was cut off." Woods' mother begged them to take him to the hospital," but they refused. Fifteen days later, Woods died of a blood clot originating in a gangrenous foot, the lawsuit alleges, also alleging that he was treated as a "problem prisoner" rather than a man suffering from a life-threatening infection.

294.    Woods' case came about five months after Nikki Listau died and about two months before Tanisha Jefferson died, all after serving time in the same jail. Listau, 60, was arrested at her home and charged with harassing communications on March 10, 2013. She couldn't walk and had to be booked into the jail in a wheelchair, another lawsuit states.[47]

295.    These prior incidents constitute a policy, custom, practice, or pattern which caused the deliberate-indifference to Mr. Pemberton's right to adequate medical care. But for this unconstitutional policy, custom, practice, or pattern, ACH and Scott County Defendants would not have violated Mr. Pemberton's constitutional rights but instead would have afforded him adequate medical care for his serious medical needs, including providing him with the necessary antibiotics and immediate hospitalization.

296.    Mr. Pemberton's death was proximately caused by Scott County's and ACH's unconstitutional customs, policies and procedures.

297.    Plaintiff seeks any and all damages allowable under state or federal law, attorney's fees under 42 U.S.C. § 1988, costs, and discretionary costs.

---

[47]The docket in *Woods* indicates that Woods's claims were settled and the case was dismissed by stipulation.

-79-

## COUNT EIGHT

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
## 42 U.S.C. §§ 1983 and 1988

## (MONELL CLAIM)
## Failure to Train and/or Supervise

## (Against Advanced Correctional Healthcare)

298.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

299.     Upon information and belief, ACH through its own policies and procedures, has failed to adequately train and supervise its employees, officers and agents (medical personnel or otherwise) to provide detainees and inmates adequate medical care for serious medical needs.

300.     ACH failed to adequately train and supervise its employees, officers, and agents to provide detainees adequate medical care for serious medical needs. Specifically, but for ACH's improper policies and procedures, it is hard to believe how: (a) Mr. Pemberton was permitted to suffer with a staph infection so pervasive that it affected his ability to eat, stand, walk, and control his bodily functions, ultimately reaching the point at which he had to be carried to a chair and dragged to the showers to be cleaned after repeatedly defecating and urinating on himself; (b) Nurse Massengale met with Mr. Pemberton on only one occasion (July 8, 2016) and despite his numerous pleas for medical attention (and pleas by inmates on his behalf), she never met with him again; and © Dr. Capparelli failed to examine Mr. Pemberton at any point during his 14-day incarceration, despite knowing that Mr. Pemberton's condition was serious.

-80-

301.     ACH has failed to adequately train and supervise its employees, officers, and agents to provide inmates adequate medical care for serious medical needs. ACH's failure to train resulted in Mr. Pemberton's inadequate medical care.

302.     Dr. Capparelli and Nurse Massengale were employees of ACH. At the time of their conduct relative to Mr. Pemberton, both were acting within the scope of their employment. ACH was responsible for hiring, training and supervising Dr. Capparelli and Nurse Massengale. ACH was negligent in hiring, training and supervising Dr. Capparelli and Nurse Massengale and its negligence was the proximate cause of Mr. Pemberton's death.

303.     ACH, Dr. Capparelli, and Nurse Massengale, with knowledge of Mr. Pemberton's serious and obvious medical needs and with deliberate indifference to such medical needs, deprived Mr. Pemberton of adequate medical care, thereby substantially contributing to his death. Such acts and omissions violated Mr. Pemberton's rights, as secured by the Fourth, Eighth and/or Fourteenth Amendment to the United States Constitution.

304.     ACH and Dr. Capparelli had a duty to establish and implement policies, practices and procedures designed to assure that Mr. Pemberton was properly monitored and received adequate medical care.

305.     ACH and Dr. Capparelli either failed to establish appropriate training and policies designed to assure that Mr. Pemberton was appropriately assessed before booking and that he was properly monitored and treated after being incarcerated, or, alternatively, failed to enforce such training and policies.

306. ACH and Dr. Capparelli, knowing of the serious medical needs of Mr. Pemberton, had a constitutional duty to instruct, supervise and train employees to assure the Mr. Pemberton was appropriately assessed before booking and monitored to ensure his safety.

307. ACH, Dr. Capparelli, and Nurse Massengale permitted, encouraged, tolerated and/or knowingly acquiesced in an official pattern, policy or practice violating the constitutional rights of inmates, including Mr. Pemberton. The actions of ACH, Dr. Capparelli, and Nurse Massengale complained of herein were unjustified, unreasonable, and unconstitutional, and constituted a violation of Mr. Pemberton's clearly established rights, privileges, and immunities guaranteed to him by the Fourth, Eighth and/or Fourteenth Amendment to the United States Constitution.

308. Plaintiff seeks any and all damages allowable under state or federal law, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

### COUNT NINE

### WRONGFUL DEATH

### TENN. CODE ANN. §§ 20-5-106 et seq.

### (Against Individual Scott County Defendants)

309. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

310. Plaintiff brings this action as the Court-appointed Administratorix and personal representative of the Estate of Benny Shane Pemberton, as authorized by Tenn. Code Ann. §§ 20-5-106 et seq., Tennessee's Wrongful Death Statute.

311. Defendants Ronnie Phillips, Tommy Silcox, Randy Lewallen, Brittney Brown, Derek Phillips, Lee Johnson, Amy Nicely, Tanner Boshears, and Shane Mason ("Individual Scott County

-82-

Defendants") owed a duty of due care to Mr. Pemberton at all times relevant to this action, and violated that duty in the manner alleged herein.

312.    The Individual Scott County Defendants knew that Mr. Pemberton, an inmate in their custody and care, had serious medical needs, as evidenced by his numerous and worsening symptoms. Despite knowing that Mr. Pemberton was seriously ill and that his condition was rapidly deteriorating, the Individual Scott County Defendants ignored Mr. Pemberton's complaints and symptoms, and the complaints of other inmates on his behalf, and failed to insure appropriate medical care to Mr. Pemberton throughout his incarceration.

313.    Mr. Pemberton's staph infection was allowed to spread from his left foot to his brain and other organs.  By the time the Sgt. Brown ordered EMTs for him, he was unconscious and never recovered, dying hours later, on July 20, 2016.

314.    The foregoing acts of the Individual Scott County Defendants proximately caused fatal injuries to Mr. Pemberton, entitling Plaintiff to recover compensatory damages from the Individual Scott County Defendants for all such damages.  Said damages include, but are not limited to, the tremendous pain and suffering Mr. Pemberton suffered before his death, Mr. Pemberton's lost wages, and medical, funeral, and/or related burial expenses.

315.    The intentional, negligent, and negligence per se acts of the Individual Scott County Defendants were performed knowingly, wantonly and with gross disregard for the safety and welfare of Mr. Pemberton. Said acts entitle Plaintiff to joint and several judgments for punitive damages from all of the Individual Scott County Defendants.

316.    Based upon the foregoing allegations of this Complaint, Plaintiff is entitled to recover a judgment against the Individual Scott County Defendants, jointly and severally, in the amount of

-83-

Five-Million ($5,000,000) Dollars in compensatory damages, and Five Million ($5,000,000) Dollars in punitive damages.

## COUNT TEN

### OUTRAGEOUS CONDUCT/ INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Individual Scott County Defendants)

317.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

318.    The allegations outlined herein against the Individual Scott County Defendants, while acting under color of law, were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress.

319.    The conduct of the Individual Scott County Defendants, as alleged above, was outrageous. They knew, or should have known, that their conduct would result in serious injuries and severe emotional distress to Mr. Pemberton, and their conduct was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, mental anguish, and severe emotional distress upon Mr. Pemberton.

320.    The wrongful acts of the Individual Scott County Defendants were willful, oppressive, intentional and malicious; therefore, punitive damages should be assessed against them in an amount deemed sufficient to punish and deter them and others in similar positions of authority from engaging in similar conduct in the future.  By reason thereof, Plaintiff claims punitive damages in an amount to be proven at trial.

-84-

## VIII.   JURY DEMAND

241.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.    That Defendants be served with a copy of this Complaint and be required to answer;

B.    That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

C.    That the Estate of Benny Shane Pemberton, through Scott Allen Pemberton, its Administrator and personal representative, be awarded such compensatory damages as will fully compensate the Estate for all injuries caused by Defendants' actions, not to exceed $5,000,000;

D.    That the Estate of Benny Shane Pemberton, through Scott Allen Pemberton, its Administrator and personal representative, be awarded punitive damages against the Defendants in an amount to be determined by the trier of fact, not to exceed $5,000,000;

E.    That the Estate of Benny Shane Pemberton, through Scott Allen Pemberton, its Administrator and personal representative, recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law;

F.    That the Estate of Benny Shane Pemberton, through Scott Allen Pemberton, its Administrator and personal representative, be awarded pre-judgment and post-judgment interest as permitted by common law or applicable statute; and

-85-

G.     That the Estate of Benny Shane Pemberton, through Scott Allen Pemberton, its

Administrator and personal representative, be awarded such other or further relief as may be just and

proper.

Respectfully submitted, this 2nd day of January, 2020.


/s/ Lance K. Baker
Lance K. Baker
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: 865-525-7028
Fax: 865-525-4679
lkbakerlaw@gmail.com

*Counsel for Plaintiff*

-86-